2008-NMCA-001

175 P.3d 929

**STATE of New Mexico, Plaintiff–Appellant,**

v.

**Joe ORTEGA, David Ortega, and Joshua Romo, Defendants–Appellees.**

**No. 26,533.**

Court of Appeals of New Mexico.

Sept. 19, 2007.

Certiorari Denied, No. 30,697, Dec. 10, 2007.

Gary K. King, Attorney General, Santa Fe, NM, Joel Jacobsen, Assistant Attorney General, Albuquerque, NM, for Appellant.

John Bigelow, Chief Public Defender, Will O'Connell, Assistant Appellate Defender, Santa Fe, NM, for Appellees.

## OPINION

KENNEDY, Judge.

{1} In this case we hold that the circumstances under which hearsay statements that were made by a child victim of criminal sexual penetration to a Sexual Assault Nurse Examiner (SANE) nurse are testimonial and subject to analysis under the Confrontation Clause. The district court's order excluded the statements for the following reasons: (1) the SANE nurse's primary reason for questioning Child was to obtain information about the alleged sexual abuse, (2) the SANE nurse was acting in concert with law enforcement, and (3) Child's statements were testimonial and subject to the Confrontation Clause. We affirm, but also hold that contrary to the district court's belief, a statement obtained under these circumstances would not be obtained for purposes of medical diagnosis or treatment.

## BACKGROUND

### Facts Regarding Child and Her Examination

{2} Child's mother overheard her live-in boyfriend, Defendant Joe Ortega, state to another person that he was going to be the "first to do" the eight-year-old Child. Mother believed that he was talking about having sex with her daughter. The following day, mother and Child had a conversation in which Child broke down and told her mother that she had been sexually molested by each Defendant. Two days after this conversation, Mother took Child to the Española Hospital emergency room. The staff at the emergency room contacted law enforcement and the SANE program at St. Vincent's Hospital in Santa Fe. Officer Lewandowski from the State Police responded and talked to the head nurse in the SANE program, Nurse Lopez, who was out of town at a conference. It was determined that an immediate, acute physical examination of Child for injuries and to collect and preserve evidence was required.

{3} Officer Lewandowski and Child's mother brought Child to the emergency room for the SANE examination. During the examination, a "sexual assault exam kit" examination was performed by Nurse Green to collect physical evidence (e.g., vaginal swabs, urine sample) for forensic examination. As she had been instructed, Nurse Green did not ask Child questions or take a history from her. Nurse Green gave the evidence she had collected to Officer Lewandowski following the exam. Child was given no medical treatment at that time. Nurse Green testified that she prepared the sexual assault exam kit for the purpose of collecting evidence, but did not take a history from Child because she was not performing a full SANE examination.

{4} Sometime after the physical examination, Child participated in a videotaped Safehouse interview. Four days after the acute examination, another SANE examination was performed by Nurse Lopez. This examination did not include the "evidence-collecting function" of the full SANE examination, because Nurse Green had already performed that portion of the exam. Nurse Lopez testified regarding the importance of taking a history and relating that history to the symptoms present in Child.

{5} Nurse Lopez did not see the Española Hospital report concerning Child or the chart from Nurse Green's examination prior to her examination. She did speak with Officer Lewandowski who told her that Child had disclosed child abuse. Nurse Lopez asked Child why she was there, at which time, Child gave a spontaneous narrative; which was an occurrence that Nurse Lopez regarded as common, as "probably 99 percent of the children ... will say they know exactly why they are here and they spontaneously will give a disclosure." Nurse Lopez took down the information by hand, which is her common practice. Again, Child was not provided

medical treatment. Nurse Lopez stated that her duty as a member of the SANE multidisciplinary team was to forward the information she gathered to the New Mexico State Police, the District Attorney's office, and the New Mexico Coalition of Sexual Assault Programs.

**Facts Concerning SANE Programs and Their Operations**

{6} In this case, three professionals associated with the SANE program testified in the district court. In addition to Nurses Green and Lopez, Dr. Jamie Lisa Gagan testified in her capacity as the medical director of the SANE program. She is a medical doctor, as required by the U.S. Department of Justice for SANE programs. Dr. Gagan was out of town with Nurse Lopez when Child was brought to the Española Hospital emergency room and joined in the consultation with Nurse Green as to what to do.

**Other Procedural Facts**

{7} The district attorney's investigator attempted to make contact with Child prior to trial, without success. Child's mother reported that she did not know of her daughter's whereabouts because Child's biological father had taken her away. The father did not cooperate, alternatively telling the district attorney's investigator that he wanted to protect his daughter from further trauma and that he was afraid of Defendant. The State's investigator was unable to determine Child's whereabouts. The district court ruled that the State had not exhausted every reasonable means of procuring Child's testimony, and therefore the State had not made a sufficient showing of her unavailability to testify.

{8} The State filed a motion in limine on January 12, 2006, to allow the use of the videotaped Safehouse interview in lieu of testimony, following which Defendants filed a joint motion in limine seeking to exclude the in-court testimony and out-of-court statements of Child. The district court initially allowed the admission of the statements made to Nurse Lopez, and transcribed by her, but limited it to those parts relevant to establish the basis for medical diagnosis or treatment. The following day, the district court sent out an explanatory letter changing its ruling to allow the use of the transcript as substantive evidence of the truth of the matters discussed therein, as a statement made for medical diagnosis and treatment under Rule 11–803(D) NMRA. The district court further noted that this Court had recently decided *State v. Romero*, 2006–NMCA–045, 139 N.M. 386, 133 P.3d 842 [hereinafter *Romero I*], *aff'd*, 2007–NMSC–013, 141 N.M. 403, 156 P.3d 694, which by its fact-dependent analysis might compel the reconsideration of its order. Defendants promptly filed a motion for reconsideration, and the district court conducted an evidentiary hearing. Following the hearing, the district court's order reiterated its prior exclusion of the Safehouse videotaped statement, and granted Defendant's motion in limine to exclude evidence of Child's statements to Nurse Lopez. In announcing its ruling from the bench, the district court gave a commendably thorough exposition of its thinking. The State only appeals the ruling excluding evidence of Nurse Lopez's transcription of Child's statements to her during the SANE interview.

**DISCUSSION**

{9} Focusing then solely on the exclusion of the statements given by Child as contained in the report of Nurse Lopez, the State asserts that: (1) the district court applied an incorrect legal standard that has since been modified or overruled by *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); (2) the district court otherwise erred in applying our decision in *Romero I*, because the facts in that case differ from the facts here; (3) the purpose of the SANE examination is not evidence gathering; and (4) the district court should not have ruled as it did without specifically finding that Child "engaged in testifying as a witness," and evaluating the involvement of law enforcement practices or purposes in the SANE process.

{10} This Court's decision in *Romero I* was affirmed by our Supreme Court about a month after the State filed its reply brief in this case. *See State v. Romero*, 2007–NMSC–013, 141 N.M. 403, 156 P.3d 694 [hereinafter *Romero II*]. Neither side has

seen fit to view it as supplemental authority in the intervening months, but its clarifications of *Romero I* are quite useful, not in the least to dispel the State's misapprehension that *Romero I* was somehow overruled by *Davis.* We review this Confrontation Clause question de novo. *Romero I,* 2006–NMCA–045, ¶ 12.

> We review the trial court's ruling on Defendant's motion to suppress to determine whether the law was correctly applied to the facts, viewing them in the manner most favorable to the prevailing party. While we afford de novo review of the trial court's legal conclusions, we will not disturb the trial court's factual findings if they are supported by substantial evidence.

*State v. Leyba,* 1997–NMCA–023, ¶ 8, 123 N.M. 159, 935 P.2d 1171 (internal quotation marks and citations omitted).

{11} *Romero I* was not overruled by *Davis.* Our Supreme Court affirmed this Courts holding that the victim's statements to a SANE examiner was testimonial. *See Romero II,* 2007–NMSC–013, ¶¶ 14, 18. In so holding, our Supreme Court explicitly took the United States Supreme Court decision in *Davis* into account. *Romero II,* 2007–NMSC–013, ¶¶ 16–17. Our Supreme Court held that the portions of the victim's statements that accused the defendant of sexual assault and other charges should have been excluded because those statements were testimonial. *Id.* ¶ 17. This decision comports with the United States Supreme Court's decision in *Davis* with regard to testimonial statements.

■ {12} The district court did not err in comparing the facts of this case to the facts in *Romero I.* These cases are analogous: in both cases law enforcement arranged for the SANE interview, the SANE interview took place sometime after the alleged sexual assault, the victim had already participated in formal legal proceedings, i.e., the Safehouse interview, statements implicating the defendants were made to the SANE nurse, and those statements were immediately turned over to law enforcement. *See Romero I,* 2006–NMCA–045, ¶¶ 53–56. Here, the district court suppressed the statements made

to Nurse Lopez. The State succinctly described it as "nothing but a description of the sexual abuse she suffered." We agree with the State: the SANE examination was nothing more than a description of the sexual abuse Child suffered, with no medical purpose behind it.

{13} The district court did not misjudge the legal significance of certain facts in this case. The district court appropriately weighed and considered all of the facts and legal precedents. *See Clayton v. Trotter,* 110 N.M. 369, 373, 796 P.2d 262, 266 (Ct.App. 1990) (explaining that an appellate court need not consider unclear arguments). The State contends that the district court erred by not concluding that Child was engaged in testifying as a witness, but fails to point out how that would be established or significant. Therefore, we decline to address that contention.

## The Confrontation Clause and the Exclusion of Testimonial Hearsay Statements

■ {14} "[T]he Confrontation Clause bars the use of out-of-court statements made by witnesses that are testimonial, unless the witness is unavailable, and the defendant had a prior opportunity to cross-examine, regardless of whether such statements are deemed reliable." *Romero II,* 2007–NMSC–013, ¶ 6. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Crawford v. Washington,* 541 U.S. 36, 68–69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). However, the *Crawford* Court expressly refused to define "testimonial." The *Crawford* Court held that "[s]tatements taken by police officers in the course of interrogations are ... testimonial under even a narrow standard." *Id.* at 52, 124 S.Ct. 1354. The Court addressed the issue of "testimonial" in *Davis.* The Court concluded that statements given to a police officer at the scene of a domestic altercation were testimonial while statements given to a 911 operator were not. *Davis,* 547 U.S. at ——, 126 S.Ct. at 2277–78.

{15} The district court ruled that the State had not adequately established Child's unavailability, and that ruling is not an issue in this appeal. Simply put, this is a case where the defense had no opportunity to cross-examine Child. We now consider whether Child's statement was testimonial because if it was, its admission is barred by the Confrontation Clause. *See Romero I,* 2006–NMCA–045, ¶ 54. We review two arguments: whether her statement was made for purposes of medical diagnosis and whether it was testimonial.

**The SANE Interview Was Not Conducted for Purposes of Medical Diagnosis or Treatment**

{16} The State sought to establish that the statement given to the nurse was admissible under Rule 11–803(D) as an exception to the hearsay rule. The State contends Child's statements were not testimonial because they were made primarily for purposes of medical diagnosis and treatment. We recognize that "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are admissible under the rules of hearsay. Rule 11–803(D). The State's position found support with the district court, who nevertheless ruled that Confrontation Clause issues trumped a valid hearsay exception.

{17} The court's initial two rulings in this regard illustrate the two ways such evidence may be offered. The court's initial ruling was that the statement was admissible only to the extent of parts that were relevant to establish a basis for medical treatment. *See Waldroop v. Driver–Miller Plumbing & Heating Corp.,* 61 N.M. 412, 417, 301 P.2d 521, 524 (1956) (distinguishing statements used by physicians to give treatment based on them from statements that are true). The district court then changed its position, allowing the use of the transcript as evidence of the truth of the assertions made by Child in the interview.

{18} Both the rule and *Crawford* jurisprudence draw our focus to the "purpose" of the interview or interrogation in which a statement is taken. The State, while asserting that any statement given to a medical professional satisfies the rule, also states that the "core purpose of a medical consultation is about as far from courtroom testimony as it is possible to get." This is an artificially diametric view of the purposes of witness statements in a case such as this. Although we return to this theme, we first address the purpose of the SANE examination.

{19} The evidence is clear in this case that Child never received any medical treatment from either part of the SANE examination as a result of the sexual assault. To the contrary, Nurse Green's examination was primarily intended "to establish or prove past events potentially relevant to later criminal prosecution." *Davis,* 547 U.S. at ——, 126 S.Ct. at 2274. Nurse Green's examination, was solely to obtain "sexual assault kit" samples to be immediately turned over to law enforcement for evidentiary purposes. This had to be conducted immediately, because of a limited time window for the types of evidence involved. Though the State says that this "was not a SANE examination," Nurse Green testified that it was not a *"full* sexual assault nurse exam," which would involve a medical consultation and taking of a history. (Emphasis added.) Such an exam is certainly part of the SANE protocol.

{20} Similarly, Nurse Lopez's examination was primarily intended to establish past facts rather than for purposes of medical treatment. Nurse Lopez undertook another SANE examination, at the SANE office, four days after Child was brought to the Española Hospital; she did not examine the medical report prepared by the hospital or Nurse Green's report. Nurse Lopez testified that such medical records did not "pertain" to her function. Child's background was provided by Officer Lewandowski, who further informed her that Child had disclosed abuse. Nurse Lopez offered no medical treatment, and forwarded the information she obtained solely to various law enforcement agencies.

{21} Dr. Gagan characterized the SANE examination as a "forensic evaluation that

has medical examination features to it, and if it's appropriate, to determine which forensic evidence needs to be recorded or collected." Ballentine's Law Dictionary defines "forensic" as "pertaining to or belonging to the courts." Ballentine's Law Dictionary 488 (3d ed.1969). Specifically, Dr. Gagan described a forensic medical examination as different from a medical examination in both the type of information sought and the method used in seeking it. Its primary purpose is to evaluate and record possible injuries, record any injuries found, work with law enforcement and child services agencies, and determine if the child is in a safe environment. We think the district court fairly characterized the SANE exam as a "forensic exam with medical features." The United States Department of Justices's description of SANE program operations states that

> [t]he SANE or other medical personnel (e.g., emergency department physicians or nurses) first assess the victim's need for emergency medical care and ensure that serious injuries are treated. After the victim's medical condition is stabilized or it is determined that immediate medical care is not required, the SANE can begin the evidentiary examination.

Sexual Assault Nurse Examiner (SANE) Programs, http://www.ncjrs.gov/App/Publications/alphaList.aspx?alpha=S. While SANE personnel might treat medical conditions requiring immediate attention for a victim's safety, "further evaluation and care of serious trauma is referred to a designated medical facility or physician." *Id.* Any medications provided the victim by SANE personnel are "prophylactic . . . for the prevention of sexually transmitted diseases . . . and other care needed as a result of the crime." *Id.* Clearly, the SANE examination is one geared for the preparation, collection, evaluation and disposition of evidence, and all medical treatment provided is relative to the patient being a victim of a sexual crime. We believe that this purpose exists in concert with the very things that might make a statement obtained thereby "testimonial" under *Romero II* and *Davis.*

{22} While we have recognized that statements identifying a perpetrator may be important to subsequent psychological treatment and may be evidence on which a medical professional might rely in providing such treatment, *State ex rel. Children, Youth, & Families Dep't v. Frank G.,* 2005–NMCA–026, ¶ 31, 137 N.M. 137, 108 P.3d 543, that is not our current situation, as a SANE is not in the business of providing ongoing treatment. We also recognize that the statements may have had a medical purpose, but that does not preclude statements from also being testimonial. *Hernandez v. State,* 946 So.2d 1270, 1283 (Fla. Dist.Ct.App.2007); *Romero I,* 2006–NMCA–045, ¶ 58 ("Even if a statement falls within the hearsay exception for statements made for the purpose of obtaining medical diagnosis or treatment, it may still be testimonial.").

{23} Our Supreme Court agreed with this view of a SANE examination under the circumstances in *Romero,* noting that the statement in that case, "while relevant to medical treatment, accuse[d][d]efendant of specific criminal acts." *Romero II,* 2007–NMSC–013, ¶ 15. Our Supreme Court's suggestion that medical portions might be separated from testimonial portions in the victim's narration, also suggested by the State in their brief, would not work here.

{24} The statements given by Child and recorded by Nurse Lopez described nothing but Defendants assaulting her by rubbing parts of her body, and demanding that she rub parts of theirs. She described times and places where and when this happened, and stated that Defendants had told her not to tell her mother because they did not want to get in "big trouble." She stated that her mother found out because of "black hair on [her] underwear." Under a report form heading of "Other Pertinent History," nothing appears. No other parts of the report are germane to medical diagnosis or treatment. No "evidence of findings or trauma" to Child's body were noted and no medications were prescribed. The report notes anal contact with Child with a finger and Child's anus was examined by Nurse Lopez for evidence of abuse, but the report discloses no other penetration or contact. Nurse Lopez's narrative impression was that

Child had provided a "clear history of sexual abuse" and described it. Nurse Lopez noted physical findings relative to the described sexual contact, but made no other medical findings, diagnoses, prognoses, or recommendations. The discharge recommendation was merely "[f]ollow up with support services as needed." The report was then forwarded to Officer Lewandowski.

{25} While a SANE evaluation does not emphasize obtaining a detailed victim statement concerning the events and circumstances of abuse in the same way the Safehouse interview does, the purpose of the SANE examination is geared toward obtaining the victim's verbal account of abuse to then begin looking for physical manifestations that confirm or confound the account, thereby obtaining forensic evidence to be used in court. In this case, this is all that occurred. Obtaining statements that might be relevant to medical treatment is a significant step short of obtaining statements for the purpose of *engaging* in medical treatment.

{26} While it is apparent that the SANE process might result in a referral for other medical treatment in another case, it is also apparent that the medical needs of Child were not a primary object of Nurse Lopez's SANE examination, and were secondary to its purpose of gathering evidence suggested by Child's statement. Based on the location and circumstances of the interview, the testimony that this was a "forensic examination," and the report of the examination itself, we hold that Lopez's examination was not conducted for the purpose of medical diagnosis or treatment.

{27} The State's categorical assertion that a "doctor's examining room is not a substitute for the witness box" substitutes the mere location or presence of a medical professional for the purpose of Child's examination. As noted above, it is the primary purpose of the interview with a declarant that triggers the nature of the statement obtained in its course. The statements obtained from Child were not "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the incep-

tion or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment," Rule 11–803(D), but constituted a statement designed to guide the SANE examiner in seeking other forensic evidence of a crime.

## Child's Statement to Nurse Lopez was Testimonial

 {28} Whether statements are considered testimonial is based on the purpose of the statement being received.

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an *ongoing emergency*. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at ——, 126 S.Ct. at 2273–74 (emphasis added). Statements are testimonial "when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at ——, 126 S.Ct. at 2273–74; *Romero II*, 2007–NMSC–013, ¶ 7. A testimonial statement is never admissible unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 53–54, 124 S.Ct. at 1365–66.

{29} At the core of the analysis is the objective purpose of the interrogation; what Justice Thomas called "the function served by the interrogation." *Davis*, 547 U.S. at ——, 126 S.Ct. at 2283 (Thomas, J., concurring in the judgment and dissenting in part); *see also State v. Ybarra*, 111 N.M. 234, 236–38, 804 P.2d 1053, 1055–57 (1990) (holding that questioning by emergency room nurse about circumstances of a shooting was an "interrogation"); *State v. Javier M.*, 2001–NMSC–030, ¶ 29, 131 N.M. 1, 33 P.3d 1 (noting that "interrogation" is sometimes defined as formal or systematic questioning).

While this Court's *Romero I* opinion spoke about the interrogator's intent, the Supreme Court focused on the functional purpose of the conversation that elicited the statement. *Compare Romero I*, 2006–NMCA–045, ¶ 60, *with Davis*, 542 U.S. at ——, 126 S.Ct. at 2273–74. The State's assertion that Child must somehow "engage" in testifying like a witness is misguided; the purpose of the interrogation-the process of asking questions designed to elicit an answer useful for an ascertainable purpose-is more important than a declarant "engaging" in anything analogous to testifying on a witness stand. *See Davis*, 547 U.S. at ——, 126 S.Ct. at 2273–74 ("[Statements] are testimonial when the circumstances objectively indicate that there is no ... ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.").

{30} This case is similar to one recently decided by the Illinois Supreme Court. *See People v. Stechly*, 225 Ill.2d 246, 312 Ill.Dec. 268, 870 N.E.2d 333 (2007). In *Stechly*, the clinical specialist in charge of the hospital's child-abuse team interviewed the child victim twice. *Id.* at 363–64. The first interview was occasioned by the child's mother bringing her to the emergency room, necessitating an interview and an examination. *Id.* at 363. After the first interview, the clinical specialist told the child's mother that she would file a report, contact the police, and make sure the Department of Children and Family Services was notified. *Id.* at 364. The child returned to the hospital for a second interview, this time with law enforcement watching in a separate room separated by a one-way window. *Id.* The Illinois Supreme Court held that the second interview was "for the benefit of two police officers" and that it left "no room for doubt that at this time [the specialist] was acting on behalf of the police in order to gather information for possible prosecution." *Id.* The court also held that the first conversation with the specialist was also a testimonial statement because the clinical specialist was already aware that abuse may have occurred. *Id.* The court further noted that "nothing in the record indicates that [the specialist] conducted the first inter-

view for purposes of treatment in this case." *Id.* at 365.

{31} The present case also bears striking similarities to *United States v. Gardinier*, 65 M.J. 60 (C.A.A.F.2007). In *Gardinier*, a few days after the child victim was brought to the hospital, the sheriff's department conducted an interview. *Id.* at 65. Immediately after the interview, the child was examined by a nurse. *Id.* The nurse was a self-described "clinical forensic specialist" and performed a forensic medical examination on the child. *Id.* The nurse completed an examination form, including a section on patient history in which she put statements that the child had made about the defendant's actions. *Id.* At trial, the defendant objected to the nurse's testimony about the child's statement on hearsay grounds, but it was admitted over the objection. *Id.* The court utilized a *Crawford* analysis, benefitted by the Supreme Court's formulations in *Davis*. *Gardinier*, 65 M.J. at 65. Ultimately, the court looked at the statement within the "totality of the circumstances surrounding the statement ... determin[ing] if the statement was made or elicited to preserve past facts for a criminal trial." *Id.* It determined that the statements were "elicited in response to law enforcement inquiry with the primary purpose of producing evidence with an eye toward trial." *Id.* at 65–66. The court focused on the law enforcement purpose behind the exam, as evidenced by the report, the nurse's testimony, and her questions to the child. *Id.*

{32} In the present case, Nurse Lopez was not qualitatively different from a crime scene investigator (albeit one trained in sensitively dealing with persons who are victims of sexual crimes and abuse). The crime had already occurred. It was Nurse Lopez's job to interview the witness to the crime to specifically develop a method by which the crime scene will be examined for evidence. As with any forensic investigator, the nurse must know where the crime was committed, by what method or instrumentality, and then proceed to examine, preserve and evaluate physical evidence to which she had been led, as well as other evidence that may be found. In a case such as this, and as evidenced by the physical examination report, the victim's own

body is the crime scene, and the examination is directed for forensic purposes by the victim's statement to the nurse. Those places where Child stated she was touched were examined, and the opinions and conclusions reported by the nurse dealt with how her observations were or were not congruent with evidence of possible sexual abuse, not her observations as giving rise to a need for medical treatment.

{33} By the standard enunciated in *Davis,* the statement given to the nurse was not for purposes of medical diagnosis, but was testimonial in nature. It was a statement given after the crime had been committed for purposes of forensic investigation, the ascertainment of physical evidence, and (incidentally or not) the identity of Defendants.

{34} It may be that cases arise where identifying an offender or searching for physical evidence of sexual victimization are secondary to an overarching medical purpose in obtaining a victim's statement. We have recognized one such eventuality in *Frank G.,* 2005–NMCA–026, ¶ 30. "Statements revealing the identity of the child abuser are reasonably pertinent to treatment because the physician must be attentive to treating the child's emotional and psychological injuries, the exact nature and extent of which often depend on the identity of the abuser." *Id.* (internal quotation marks and citation omitted). This case is not analogous.

{35} In the present case, any necessity for medical treatment as a result of the abuse had ended. Child had presented at an emergency room and required no treatment, but her appearance there, the allegation of abuse, and the obligation of medical professionals to report child abuse began the chain of events that resulted in bringing a criminal case against Defendant. Objectively viewed, the primary purpose of Nurse Lopez's SANE examination was to develop and preserve evidence, and even though the statement elicited from Child was only part of that picture, the fact that it is part of a larger picture does not diminish its testimonial nature. Considering all the circumstances that bear on Nurse Lopez's intent in questioning Child, we note that the primary purpose in her SANE interview was to prove some past fact for use in a criminal trial rather than to meet an ongoing emergency.

## CONCLUSION

{36} The district court properly regarded Child's statement given as part of the SANE examination as testimonial in nature. Child's statement was not made for purposes of medical diagnosis or treatment. Given that Child was not unavailable for trial, and that Defendants had no opportunity to cross-examine her, the nurse's testimony regarding Child's statement was properly excluded. The district court is affirmed.

{37} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, Chief Judge and CYNTHIA A. FRY, Judge.