**Certiorari Granted, No. 31,723, June 23, 2009**

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2009-NMCA-060**

**Filing Date:  April 13, 2009**

**Docket No.  28,261**

**STATE OF NEW MEXICO,**

      **Plaintiff-Appellant,**

**v.**

**BERNADINO MENDEZ, SR.,**

      **Defendant-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Michael E. Vigil, District Judge**

Gary King, Attorney General
Santa Fe, NM
Joel Jacobsen, Assistant Attorney General
Albuquerque, NM

for Appellant

Jones, Snead, Wertheim, & Wentworth, P.A.
Lee R. Hunt
Jerry Todd Wertheim
Santa Fe, NM

for Appellee

**OPINION**

**VANZI, Judge.**

1

**{1}** This appeal presents us with another opportunity to address the admissibility of out-of-court statements made by a child to a sexual assault nurse examiner (SANE nurse). We addressed this issue in *State v. Ortega*, 2008-NMCA-001, ¶¶ 16-37, 143 N.M. 261, 175 P.3d 929 (filed 2007), *cert. denied*, 2007-NMCERT-012, 143 N.M. 213,175 P.3d 307, and held that the child's statements to a SANE nurse were inadmissible. We concluded that statements made during a SANE examination are not for purposes of medical diagnosis or treatment, *see* Rule 11-803(D) NMRA, because a SANE examination is for the purpose of gathering evidence to support a criminal prosecution. *Ortega*, 2008-NMCA-001, ¶¶ 16-27, 33.

**{2}** In this case, the evidence established that: (1) Victim's initial pediatric medical evaluation had been completed, (2) a diagnosis of sexual abuse had been made, (3) Victim was referred to another location for a SANE examination, and (4) the New Mexico State Police had been called. When Victim arrived at the Family Advocacy Center for the SANE examination, a state police officer was at the facility and was present when Victim was interviewed. In the course of her interview, Victim answered thirty-four written questions. In her answers, Victim identified Defendant and described the sexual acts. During the SANE examination, Victim may have made several oral statements as well.

**{3}** The district court relied on *Ortega* and excluded these statements. The State appeals, contending that this case is distinguishable from *Ortega* because Victim's statements were made for purposes of medical diagnosis or treatment. *See* Rule 11-803(D). We disagree. Because there is a distinct line between the initial medical examination and the SANE examination and because the SANE examination was for the purpose of gathering evidence to support a criminal investigation, we hold that Victim's statements do not qualify for admission under the medical diagnosis or treatment exception to the hearsay rule. Consequently, we affirm the district court's evidentiary ruling.

**{4}** We also address a preliminary issue raised by Defendant that the State has no right to appeal the district court's evidentiary ruling. We conclude that under NMSA 1978, § 39-3-3(B)(2) (1972), the district court's ruling is appealable.

## I.    BACKGROUND

**{5}** Victim's mother became concerned when she discovered paper towels and Victim's underwear with blood on them under the bathroom sink. She took Victim, who was nine years old, to Arroyo Chamiso Pediatric Center where Victim was examined by Mary Helen Lopez, a nurse practitioner. Nurse Lopez is also a trained SANE nurse. She conducted her examination, found no current bleeding or trauma, and became concerned that Victim was being sexually abused. She mentioned this to Victim's mother. Mother responded that Defendant was the only one who came to mind.

**{6}** At that point, Victim asked if Nurse Lopez would leave the room so she could talk to her mother. Nurse Lopez left the room, and Victim told her mother that Defendant had sexually abused her. Mother then told Nurse Lopez, and arrangements were made for

2

Mother to bring Victim to the Family Advocacy Center, a facility where SANE examinations were performed. Nurse Lopez called the State Police to inform them of the situation.

**{7}** Approximately an hour and forty minutes later, Victim's mother brought her to the requested location where a state police officer was present. The SANE examination was divided into a physical examination and an interview, in which Nurse Lopez submitted a list of thirty-four written questions to Victim, and Victim supplied written answers. The state police officer was present during the interview portion of the examination. It is these questions and answers, along with several oral statements made by Victim, that the State characterizes as "patient history" and seeks to have admitted under Rule 11-803(D).

**{8}** Defendant was subsequently charged with two counts of criminal sexual penetration of a minor and two counts of criminal sexual contact of a minor. Before trial, Defendant moved to exclude Victim's statements from the SANE examination. On the morning of trial, the district court granted Defendant's motion and excluded the statements.

## II.    DISCUSSION

### A.    Appealability of the Order

**{9}** Before considering the merits of the evidentiary ruling, we must consider whether the State may appeal. Section 39-3-3(B)(2) allows the State to appeal from "a decision or order of a district court suppressing or excluding evidence . . . if the district attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." Defendant argues that the State does not have the right to appeal because the exclusion of the evidence did not limit the State's ability to prove its case. Defendant argues that Victim will testify at trial, so the out-of-court statements are not necessary. Defendant argues that "[e]xcluding cumulative hearsay testimony simply does not satisfy the proof required for an automatic [State's] appeal." He also asks us not to accept the prosecutor's certification without any scrutiny.

**{10}** Our concern is with two limitations on the State's right to appeal—timing and substance. *See State v. Gomez*, 2006-NMCA-132, ¶¶ 37-44, 140 N.M. 586, 144 P.3d 145 (Bustamante and Fry, JJ., specially concurring) (addressing the limitation that the state may not automatically appeal an adverse evidentiary ruling once the trial has started); *State v. Romero*, 2000-NMCA-029, ¶¶ 8-9, 128 N.M. 806, 999 P.2d 1038 (finding that the state could automatically appeal a ruling excluding evidence when the evidence was material and went to the heart of the state's case).

**{11}** Turning first to timing, we observe that the special concurrences of Judges Bustamante and Fry in *Gomez* constitute the opinion of this Court. *See Trujillo v. Baldonado*, 95 N.M. 321, 323, 621 P.2d 1133, 1136 (Ct. App. 1980) (noting that an opinion that the other two panel members do not join is not an opinion of the Court of Appeals). *Gomez* draws a line and prohibits the state from appealing under Section 39-3-3(B)(2) after the jury is impaneled and sworn. *See Gomez*, 2006-NMCA-132, ¶ 42 (Bustamante and Fry, JJ., specially concurring) (stating that the statute does not give the state the right to an

automatic appeal "after jeopardy has attached"). "In a jury trial, jeopardy attaches at the point when a jury is impaneled and sworn to try the case." *State v. Nunez*, 2000-NMSC-013, ¶ 28, 129 N.M. 63, 2 P.3d 264; *see Crist v. Bretz*, 437 U.S. 28, 35-36 (1978) (stating that when members of the jury take their oath, double jeopardy attaches). Here, the jury had been impaneled but not sworn. Consequently, though the State's attempt to take an automatic appeal was inconvenient, it was timely.

**{12}** Turning next to substance, the language used by the Legislature is "substantial proof of a fact." *Romero* interprets this to mean evidence that is "material" and goes to the "heart of the proof required to establish an essential element of the [s]tate's case." 2000-NMCA-029, ¶¶ 8-9. After stating these requirements, *Romero* then stated that the district court's ruling "made it impossible" for the state to prove its case. *See id.* ¶ 9. Defendant is correct that it was not impossible for the State to prove its case without the hearsay testimony, but we do not believe that is the appropriate test. *Romero's* statement that the district court's ruling made it impossible for the state to prove its case followed language requiring that the excluded evidence be "material" and at the "heart" of the state's case. Thus, we do not read *Romero* as allowing the state to appeal only when the district court's ruling makes it impossible for the state to prove its case. Rather, we interpret *Romero* as requiring that the excluded evidence be important or significant, as opposed to evidence of minor consequence. In this case, the evidence consisted of Victim's statements identifying the perpetrator and describing the criminal acts. This evidence is central to any criminal case.

**{13}** While we acknowledge that the evidence is hearsay and that Victim is available to testify, this does not alter our conclusion that the evidence was sufficiently material to support an automatic appeal. The evidence obviously had important value, as demonstrated by the fact that Defendant engaged in renewed efforts to keep it out, and the State sought (and seeks) to gain its admission.

**{14}** We could preclude the State from appealing by creating very strict standards about what the State may appeal and by marginalizing the out-of-court statements as urged by Defendant. But we disagree with Defendant's approach. In legal proceedings, judgments are commonly based, at least in part, on admissible hearsay. The State's and Defendant's struggle over the admission of this evidence underscores this reality.

**{15}** Additionally, there is an important distinction between the respective rights of appeal for defendants and the state. If a defendant's trial proceeds to an adverse verdict, he or she may appeal an evidentiary ruling and obtain a new trial. In contrast, if the state's evidence is excluded and the trial proceeds to a verdict that the state loses (i.e., the defendant is acquitted, or it obtains fewer or lesser convictions than it believes is warranted), the state may not appeal.

**{16}** Our law recognizes that the prosecutor must be given "'one full and fair opportunity to present his evidence to an impartial jury.'" *State v. Litteral*, 110 N.M. 138, 142, 793 P.2d 268, 272 (1990) (quoting *Arizona v. Washington*, 434 U.S. 497, 505 (1978)). The difference in the respective rights of a defendant and the state to appeal after judgment supports a conclusion that we should not overly restrict the state's right to appeal pretrial evidentiary

4

rulings. If we were to create an overly strict reading of the phrase "substantial proof of a fact material in a proceeding" in Section 39-3-3(B), we would inappropriately limit the state's right to one full and fair opportunity to present its evidence.

**{17}** We conclude that the evidence is sufficiently material and that it meets the threshold set by the statute. Therefore, the State has a right to appeal.

### B. Admissibility of Victim's Statements

**{18}** The State argues that the statements made to the SANE nurse are admissible as statements made for purposes of diagnosis or treatment and are not precluded by *Ortega.* We review the district court's ruling on this issue for an abuse of discretion. *See State v. Sarracino*, 1998-NMSC-022, ¶ 20, 125 N.M. 511, 964 P.2d 72 ("We review the admission of evidence under an abuse of discretion standard and will not reverse in the absence of a clear abuse.").

**{19}** At the outset, we note that the district court's ruling applies only to the statements made during the SANE examination. We need not and do not address the admissibility of any of Victim's statements made at the initial consultation at the pediatric center.

### 1. Our Holding in *Ortega*

**{20}** In *Ortega*, we considered whether an unavailable victim's statements to a SANE nurse about the details of the criminal offenses offered by the state under Rule 11-803(D), were precluded by the Confrontation Clause and *Crawford v. Washington*, 541 U.S. 36, 54 (2004) (holding that when declarant is unavailable, out-of-court statements that are testimonial are inadmissible even if they meet an exception to the hearsay rules). In contrast, unlike the situation in *Ortega,* Victim here is available and will testify. Therefore, we only need to address whether the hearsay exception in Rule 11-803(D) applies.

**{21}** Because *Ortega* is a confrontation case, our essential focus was on whether the statements to the SANE nurse were testimonial. However, to determine that issue, we began our analysis in *Ortega* by considering whether the purpose of the SANE interview was for purposes of medical diagnosis and treatment. *See Ortega*, 2008-NMCA-001, ¶¶ 16-27. After reviewing the essential purpose of a SANE examination, we concluded that it was not. *Id.*; *cf. State v. Romero*, 2007-NMSC-013, ¶¶ 13-18, 141 N.M. 403, 156 P.3d 694 (in determining whether statements to a SANE nurse were testimonial, our Supreme Court rejected the argument that narrative statements to a SANE nurse were for purposes of medical diagnosis and treatment and held that the victim's narrative was correctly excluded).

**{22}** In *Ortega*, we drew a distinction between medical treatment and a SANE examination, which is designed to gather evidence and prove past acts. 2008-NMCA-001, ¶ 20. We recognized that a SANE examination is a "forensic exam with medical features." *Id.* ¶ 21 (internal quotation marks and citation omitted). "Its primary purpose is to evaluate and record possible injuries, record any injuries found, work with law enforcement and child service agencies, and determine if the child is in a safe environment." *Id.* We stated that

even though a SANE examination might result in referral for medical treatment, the medical needs of the child were secondary to its primary purpose of gathering evidence. *Id.* ¶ 26. We concluded that the SANE examination was not conducted for the purpose of medical diagnosis and treatment. *Id.* Accordingly, the child's statements about what the defendants had done to her were not made for purposes of medical diagnosis and treatment. While the current case does not present the *Crawford* issue we decided in *Ortega*, the analysis in *Ortega* is relevant here.

**2.     The SANE Examination**

**{23}**     Because the distinction between a medical examination and a SANE examination is critical to our analysis, we review the facts in more detail. On September 30, 2005, Victim was examined at Arroyo Chamiso Pediatric Center by Nurse Lopez. As we have discussed, Mother was concerned about Victim's vaginal bleeding. Mother told Nurse Lopez that Victim had not bled since September 24. Victim had complained of pain on her right side but was not currently complaining of pain. Nurse Lopez conducted her physical examination, found no current bleeding, trauma, or acute injury and determined that Victim was not sufficiently developed to menstruate. Nurse Lopez then mentioned her concern to Mother that Victim had been sexually abused. Victim asked Nurse Lopez to leave the room, revealed to her Mother that Defendant had sexually abused her, and Mother relayed this information to Nurse Lopez.

**{24}**     Nurse Lopez arranged for Mother to bring Victim to another location, the Family Advocacy Center, for a SANE examination and called the State Police. On the medical form used at the Arroyo Chamiso medical office, Nurse Lopez entered her diagnosis of "child sexual abuse" and wrote, "[r]efer to SANE immediately." Nurse Lopez's initial examination ended at approximately 6:20 p.m.

**{25}**     Victim and her mother arrived at the Family Advocacy Center for the SANE examination at 8:00 p.m. the same day. A state police officer was present at the center. Nurse Lopez followed her SANE protocol, using a form specifically related to the SANE program. Mother signed an authorization allowing the results of the SANE examination to be released to the State Police and the Children, Youth and Families Department. Nurse Lopez had Mother sign a consent form stating, "I understand that a SANE exam is not a routine medical check-up. The nurse doing this exam will not be held responsible for identifying, diagnosing or treating new or existing medical problems I may have." The consent form also informs the patient that it will involve "the collection of specimens or evidence standards," that photographs may be taken, and states that a Crime Victims Reparation brochure has been provided.

**{26}**     Nurse Lopez performed a more detailed internal physical examination using a colposcope. According to the SANE report, the officer was not present during the physical examination. Nurse Lopez noted no obvious or healed injury and no obvious areas of bleeding. In addition to her physical examination, Nurse Lopez interviewed and submitted her list of written questions to Victim, and Victim supplied written answers. Nurse Lopez stated that obtaining this "history" was "[v]ery much the same as [that obtained at] Arroyo

Chamiso, but this is specific to SANE." According to the SANE report, the state police officer was present during the interview portion of the examination. When asked whether the state police were present, Nurse Lopez stated, "I believe so."

**{27}** The SANE report contained the following information. Victim stated that approximately twelve days before, Defendant had touched her with his tongue. When asked what made her bleed, Victim said that Defendant "put his finger inside and it hurt. I told him to stop but he wouldn't." Victim's statements indicated that the abuse had been ongoing since she was seven or eight years old. Victim answered that she was touched by Defendant, that Defendant did not make her touch him, and that Defendant had not asked her not to tell. Victim described that Defendant had sometimes masturbated and that he had said he had had sex with her step-cousin. In some of her answers to the questions, Victim dealt with physical locations where the offenses occurred and what Defendant said to her. These statements are similar to the statements we held were inadmissible in *Ortega*, in which the child's statements described how the defendants rubbed parts of her body, times and places when this happened, that the defendants had told her not to tell, and how her mother had found out. 2008-NMCA-001, ¶ 24.

### 3. Rule 11-803(D)

**{28}** Rule 11-803(D) provides that statements made for the purpose of medical diagnosis or treatment are an exception to the hearsay rule. The rationale for this exception is that people seeking medical treatment have incentive to be truthful. *See White v. Illinois*, 502 U.S. 346, 355-56 (1992) (stating that the rationale for the exception is that a person seeking medical services knows that a false statement may cause misdiagnosis or mistreatment).

**{29}** In *Ortega*, our holding that the statements during the SANE examination were testimonial was based on our conclusion that they were not made for diagnosis and treatment, but instead were made during a process designed to gather evidence. 2008-NMCA-001, ¶¶ 25-27. Consistency requires that we reach the same conclusion here.

**{30}** The State argues that this case is distinguishable from *Ortega*. According to the State, in *Ortega* one nurse, not a SANE nurse, collected samples at the hospital, but the actual SANE examination was not conducted until several days later. *Id.* ¶¶ 2-4. In contrast, here the examining nurse was the initial treatment nurse who then conducted the SANE examination later the same evening. The State argues that the SANE examination was a continuation of the examination at the pediatric center and that we should treat what happened as a single examination, all focused on diagnosis and treatment. The State contends that Nurse Lopez's testimony demonstrated a medical purpose that was lacking in *Ortega*. It relies on Nurse Lopez's testimony in which she explained why knowing what happened had a medical purpose and in which she stated that the physical part of her SANE examination had a medical purpose, as well, because she was still looking for clues about why Victim would have been bleeding. Finally, the State refers to Victim's "copious" bleeding, suggesting that the urgency of the situation established that the SANE examination was for a medical purpose.

7

**{31}** We are not persuaded by these arguments. In our view, the critical demarcation is the point at which the initial pediatric consultation ended and the SANE examination began. In this case, that point is definite. At the end of the pediatric consultation, Nurse Lopez knew of Victim's revelation of sexual abuse, had made a diagnosis of sexual abuse, and had entered that diagnosis on the medical record along with her conclusion that Victim should be "[r]efer[red] to SANE immediately." In Nurse Lopez's words, it was time to "move forward" with a SANE examination. There was a break in time, a change in location, and a change in purpose. During the SANE examination, the presence of a state police officer, both at the facility and during the interview, is a crucial fact underscoring our conclusion that the investigation had fundamentally changed from a medical investigation into a criminal investigation.

**{32}** We recognize that when a patient presents a sexual assault claim and is examined by a SANE nurse, one cannot neatly separate medical aspects from investigatory aspects. We do not deny that a SANE examination has medical aspects to it. For example, one of the reasons Nurse Lopez wanted to move to the Family Advocacy Center was that the facility had a colposcope that allowed for a detailed internal examination and could be useful in determining the cause of any bleeding. But it also could be used, and was used, to search for and document specific physical findings corroborating Victim's account of sexual abuse. Nurse Lopez noted in the SANE report that her physical findings were consistent with sexual abuse.

**{33}** It is true that Nurse Lopez testified about why the SANE examination had a medical purpose. She explained why she continued to look for reasons why Victim might have bled. She also explained why all of the questions about what happened could have a medical purpose. For example, she testified that it was important to know the identity of the abuser and what acts occurred in order to know what to look for in the physical examination. She stated that it would help to know whether the child had been exposed to sexually transmitted diseases. She also testified that it would also help to know whether the abuse was acute or ongoing because then the nurse would know whether injuries would be fresh or healed.

**{34}** We do not doubt that her interest in continuing to look for causes of bleeding or her medical concerns were earnest. However, they do not change the essential nature of the SANE exam and are belied by other significant evidence indicating that an equal or primary purpose was to gather evidence for use in a criminal prosecution. Nurse Lopez admitted as much. Therefore, the fact that a SANE examination has medical aspects does change the fact that, just as we held in *Ortega*, its purpose was to investigate and gather evidence of a crime.

**{35}** The State argues that the admissibility of "statements made by the same patient to the same medical provider on the same evening for the same purposes" should not depend on whether they were "made in one geographic location, but not if made in another location." This argument oversimplifies the issue. The key distinction is that the essential nature and purpose of the SANE exam is fundamentally different from a medical examination. The change in location was important only insofar as it, along with the other facts we have discussed, demonstrated a clear and fundamental change in the process.

**{36}** The State's reference to "copious" bleeding does not persuade us to distinguish *Ortega*. There is no evidence or testimony using the word "copious." So far as we can tell, the State's argument is based on Mother's statement to Nurse Lopez that the underwear and paper towels she found under the bathroom sink were "full of blood." However, when Victim was examined on September 30, there was no bleeding and no sign of an acute injury. By Mother's report, there had been no bleeding since September 24. We do not mean to denigrate the seriousness of the situation, but to the extent that the State argues that "copious" bleeding establishes an acute or emergency situation, the State is incorrect.

**{37}** Our holding that the statements are inadmissible under Rule 11-803(D) is not based solely on *Ortega*. It is also based on the essential rationale for the medical diagnosis and treatment exception. Rules and constitutional principles can only be properly interpreted by considering the rationale underlying them. *See State v. Rowell*, 2008-NMSC-041, ¶ 23, 144 N.M. 371, 188 P.3d 95. As our Supreme Court stated in *Rowell*, "[w]hen lines need to be drawn in creating rules, they should be drawn thoughtfully along the logical contours of the rationales giving rise to the rules, and not as artificial lines drawn elsewhere that are unrelated to those rationales." *Id.* The idea supporting the hearsay exceptions, including the medical diagnosis or treatment exception, is that there is something about the context that makes a statement reliable. *See State v. Self*, 88 N.M. 37, 41, 536 P.2d 1093, 1097 (Ct. App. 1975) (stating that statements are admitted under the exceptions to the hearsay rules because they are made under conditions judged to make them equal in reliability to those made at trial, under oath, and subject to cross-examination). There is nothing inherently reliable, however, about statements made during a criminal investigation focused on gathering evidence. Here, the change in purpose of the SANE examination dilutes the rationale for the medical diagnosis and treatment exception and, consequently, application of the exception is inappropriate.

**{38}** The State relies on a number of cases to support its assertion that "taking a patient's history is relevant to medical diagnosis and treatment." For example, *State v. Altgilbers*, 109 N.M. 453, 457-60, 786 P.2d 680, 684-87 (Ct. App. 1989), holds that a child's statements made to a pediatrician identifying the perpetrator are admissible under Rule 11-803(D). However, that case is distinguishable because it does not involve a SANE nurse—the pediatrician was involved in diagnosis and treatment, and there is no indication that the statements were made during an investigation designed to gather evidence. *Altgilbers*, 109 N.M. at 457-60, 786 P.2d at 684-87. Cases dealing with statements made to mental health providers, such as *State v. Woodward*, 121 N.M. 1, 8, 908 P.2d 231, 238 (1995), and to a social worker who was providing mental health treatment, *see State ex rel. Children, Youth & Families Department v. Frank G.*, 2005-NMCA-026, ¶¶ 28-32, 137 N.M. 137, 108 P.3d 543, *aff'd, In re Pamela A.G.*, 2006-NMCA-019, 139 N.M. 459, 134 P.3d 746, are also inapplicable here because mental health providers are not typically engaged in gathering evidence to support a prosecution.

**{39}** The State relies on several older cases to support its position. In *State ex rel. Children, Youth & Families Department v. Esperanza M.*, 1998-NMCA-039, ¶¶ 16-18, 124 N.M. 735, 955 P.2d 204, we held that a child's statements to a pediatrician identifying the perpetrator and describing the acts were made for purposes of medical diagnosis and

treatment and were admissible under Rule 11-803(D). The examination in *Esperanza M.*, while perhaps similar to the situation we consider in this case, is not the same. There, the statements were made to a pediatrician, were sufficiently connected to diagnosis and treatment, and the examination in that case did not bear the hallmarks of an investigation. For example, there is no indication in that case that the police were present when the statements were made. 1998-NMCA-039, ¶¶ 3, 16-18.

**{40}** Finally, *State v. Paiz*, 2006-NMCA-144, ¶¶ 36-42, 140 N.M. 815, 149 P.3d 579, holds that statements made to a nurse and a doctor, both of whom specialized in sexual assault cases, were admissible under Rule 11-803(D). *Paiz* relied on *State v. Massengill*, 2003-NMCA-024, ¶¶ 19-21, 133 N.M. 263, 62 P.3d 354, in support of its conclusion. *Paiz,* 2006-NMCA-144, ¶ 40. *Massengill*, in turn, relied on *Altgilbers* and *Esperanza M. Massengill*, 2003-NMCA-024*,* ¶¶ 20-21. Consequently, we recognize that there is a line of cases in which each cites an earlier case supporting the State's argument that Victim's statements have been considered admissible as made for purposes of diagnosis or treatment. But even if the facts in *Esperanza M.* and the other cases we have just cited can be considered the equivalent of those in this case, we believe *Ortega*, which specifically recognized that statements made to a SANE nurse are not predominately for diagnosis and treatment, has changed the legal landscape.

**{41}** Because the facts show a clear break between the initial medical examination, and the SANE examination and a corresponding change from diagnosis and treatment to a criminal investigation, we conclude that Victim's out-of-court narrative during the SANE examination does not fall within the medical diagnosis or treatment exception. We know that there is an inherent difficulty in proving cases involving sexual crimes against children, but that does not justify a different interpretation of our evidence rules or necessitate that we retreat from our limitations on out-of-court statements. *Cf. State v. Aguayo*, 114 N.M. 124, 131, 835 P.2d 840, 847 (Ct. App. 1992) (rejecting the argument that because of the difficulty in proving a crime against a child, the rules of evidence should be interpreted more loosely in child abuse cases). The State will have to prove its case through the live testimony of Victim and by other evidence.

### 4. Abuse of Discretion

**{42}** Finally, the State argues that we should not credit the district court's ruling because the district court did not exercise any discretion. The State relies on two comments by the district court. In one comment, the district court said, "once [Nurse Lopez] makes the referral to the SANE [examination], then it is no longer medical treatment, it is now evidence gathering." In the other, the district court said, "I think *Ortega* excludes it. I don't see [where] there are any exceptions." The State argues that these two comments demonstrate the district court's view that it had no choice but to exclude the evidence and, therefore, the district court did not exercise its discretion.

**{43}** We disagree. The first statement occurred at the beginning of the hearing and does nothing more than recognize the line drawn by *Ortega*. The district court also said, "after I hear the nurse, I may allow portions of what was said to come in if I'm convinced that they

10

were done for purposes of medical treatment." The district court then held an evidentiary hearing to consider Nurse Lopez's testimony, listened to legal argument, and asked its own questions of the SANE nurse. At the conclusion of the hearing, the district court decided, "I think you complete your diagnosis and your questioning and your [medical] examination, and you separate it clearly from the SANE exam, which is for the purpose of gathering evidence." The district court then concluded that *Ortega* applied and made the second statement on which the State relies. Considered in context, the district court's comment was that, having considered testimony and legal argument, it had to apply *Ortega*. The record demonstrates that the district court amply exercised its discretion in deciding whether *Ortega* applied. *See State v. Johnson*, 1997-NMSC-036, ¶ 40, 123 N.M. 640, 944 P.2d 869 (stating that a court's explanation of its reasons for excluding evidence showing that the court reached a result a judge might reasonably make "is all we require to sustain a discretionary determination"). Once the district court decided that it applied, it had to follow precedent. A district court's adherence to precedent does not demonstrate a failure to exercise discretion.

## 5.    Limitations on Our Holding

**{44}**    We emphasize that our decision that Victim's statements to Nurse Lopez are inadmissible is limited to the facts in this case. There may be other relatively rare situations in which statements to a SANE nurse might fall within medical diagnosis and treatment. We recognized as much in *Ortega*, 2008-NMCA-001, ¶ 35 (drawing a distinction between an examination designed to prove some past fact and an examination to meet an ongoing emergency).

**{45}**    We also emphasize that our opinion addresses only the precise issue of whether the statements are admissible under Rule 11-803(D). At trial, it is conceivable that some other issue regarding the admissibility of those statements could arise. Our opinion should not be read to mean that the statements are absolutely precluded at trial if a valid theory for their admission is advanced by the State.

## III.    CONCLUSION

**{46}**    The order granting Defendant's motion in limine is affirmed. We remand this case to district court for further proceedings.

**{47}    IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

11

_____

**CELIA FOY CASTILLO, Judge**



_____

**MICHAEL E. VIGIL, Judge**

Topic Index for *State v. Mendez,* No. 28,261

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-ST | State's Right to Appeal |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CN | Child Abuse and Neglect |
| CL-CP | Criminal Sexual Penetration |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-CW | Children as Witnesses |
| | |
| **EV** | **EVIDENCE** |
| EV-AE | Admissibility of Evidence |
| EV-EE | Exclusion of Evidence |
| EV-CH | Children as Witnesses |
| EV-HR | Hearsay Evidence |