IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2010-NMSC-044

Filing Date:    October 7, 2010

Docket No. 31,723

STATE OF NEW MEXICO,

        Plaintiff-Petitioner,

v.

BERNADINO MENDEZ, SR.,

        Defendant-Respondent.

ORIGINAL PROCEEDING ON CERTIORARI
Michael Eugene Vigil, District Judge

Gary K. King, Attorney General
Joel Jacobsen, Assistant Attorney General
Santa Fe, NM

for Petitioner

Jones, Snead, Wertheim & Wentworth, P.A.
Jerry Todd Wertheim
Lee R. Hunt
Santa Fe, NM

for Respondent

OPINION

BOSSON, Justice.

{1}     Under *State v. Ortega*, 2008-NMCA-001, ¶¶ 16-27, 143 N.M. 261, 175 P.3d 929, hearsay statements made to a nurse of the sexual assault nurse examiner program (SANE), during an examination of a victim of alleged sexual abuse, are rarely admissible at trial, even if some of those statements pertain to "medical diagnosis or treatment" under Rule 11-803(D) NMRA, and even if the declarant testifies at trial. We conclude that *Ortega* went too far in its hearsay analysis and in categorically excluding statements made to SANE nurses.

1

We reverse the evidentiary ruling of the trial court and the affirming opinion of the Court of Appeals that relied on *Ortega*, which we partially overrule. We remand to the trial court for further proceedings consistent with this Opinion.

## BACKGROUND

**{2}**    This interlocutory appeal comes to us from a motion to suppress evidence granted by the trial court after an evidentiary hearing. Because trial has not yet occurred and the record is necessarily incomplete, we describe the evidentiary facts as presented to the court at the evidentiary hearing with any disputed facts highlighted as necessary.

**{3}**    In September 2005, Mother of T.F., her nine-year old daughter, noticed blood on T.F.'s underwear. T.F. told her Mother that she was experiencing her menstrual cycle. Some days later, Mother found several bloody paper towels and pairs of T.F.'s underwear in a bag under the bathroom sink. Mother thought the blood did not look like menstrual discharge and decided to take her daughter to the Arroyo Chamiso Pediatric Center in Santa Fe for medical attention.

**{4}**    At Arroyo Chamiso, Mary Ellen Lopez (Nurse Lopez), a SANE[1] nurse, examined T.F. and concluded that the nine-year-old was not yet capable of menstruating. T.F. told Nurse Lopez that, during the time she was bleeding, she felt pain on the right side of her stomach; but the pain was no longer present at the time of the examination. Nurse Lopez found no current bleeding or trauma, but was concerned as to the cause of prior bleeding, and she began to suspect that T.F. had been sexually abused.

**{5}**    Nurse Lopez expressed her concern to T.F.'s Mother, who responded that the only person who came to mind as a possible suspect was Defendant, the father of Mother's then-boyfriend. Defendant lived at the house next door at the time of the alleged abuse. At that point, T.F. asked Nurse Lopez to leave the room and proceeded to tell Mother that Defendant had sexually abused her. Mother related T.F.'s revelation to Nurse Lopez, who then notified the State Police and made arrangements for a SANE examination to take place at the nearby Family Advocacy Center.

---

[1]We will elaborate more fully on the characteristics that define a SANE examination throughout this Opinion. According to sources cited by the parties, a SANE nurse has special training in treating victims of sexual assault, as well as in collecting and preserving evidence of sexual abuse for forensic use. *Compare* Rebecca Campbell et al., *The Effectiveness of Sexual Assault Nurse Examiner (SANE) Programs: A Review of Psychological*, *Medical, Legal, and Community Outcomes*, Trauma, Violence, & Abuse, 313, 313-18 (Oct. 2005) [http://tva.sagepub.com/content/6/4/313.full.pdf+html]; *with Ortega*, 2008-NMCA-001, ¶ 21. The acronym "SANE" is also used to describe the programs that employ SANE nurses, the specific examinations that SANE nurses perform, and the protocols that SANE nurses follow.

**{6}** Nurse Lopez's initial diagnosis at Arroyo Chamiso was "history of vaginal bleeding" and "child sexual abuse." She considered T.F.'s case to be "somewhat of an emergency" that needed to be "dealt with immediately." The initial examination at Arroyo Chamiso ended at approximately 6:20 p.m., and the SANE examination at the Family Advocacy Center began at approximately 8:00 p.m. that same evening. Nurse Lopez performed both examinations.

**{7}** The SANE examination at the Family Advocacy Center consisted of a physical examination and a patient-history interview with T.F. During the physical portion of the examination, Nurse Lopez used a specific instrument called a colposcope to look for any internal injury to T.F. that could explain the bleeding. This instrument, and other special equipment used during the physical examination at the Family Advocacy Center, was not available at Arroyo Chamiso.

**{8}** Most of the statements at issue in this case were made by T.F. during the interview portion of the SANE examination with Nurse Lopez. A State Police officer was present at the Family Advocacy Center during the interview, although the parties dispute whether the officer was actually present in the room where the patient-history interview took place.

**{9}** During the interview, Nurse Lopez used a series of written and spoken questions to elicit information from T.F. because, according to Nurse Lopez, T.F. was comfortable answering certain questions only in written form. The subject matter of the conversation ranged broadly, from T.F.'s description of the cause of her bleeding to specific details of the alleged abuse. In response to a direct question, T.F. named Defendant as her abuser.

**{10}** Nurse Lopez's report following the SANE exam noted "no obvious acute or healed injury," but concluded that "[u]pon physical examination the findings appear to be consistent with a penetrating injury to [T.F.'s] hymen." Nurse Lopez recommended several follow-up examinations to determine the cause of the bleeding, as well as counseling and shelter services. The record does not indicate any further interaction between Nurse Lopez and T.F. Thereafter, the grand jury returned an indictment charging Defendant with two counts of criminal sexual penetration of a minor and two counts of criminal sexual contact of a minor, in violation of NMSA 1978, Section 30-9-11(C)(1) (2003), and NMSA 1978, Section 30-9-13(C)(1) (2003).

**{11}** Defendant, arguing that T.F.'s statements to Nurse Lopez during the SANE examination were inadmissible hearsay, moved to suppress all such statements regardless of whether T.F. actually testifies at trial. The State sought to admit T.F.'s hearsay statements under the hearsay exception pertaining to "[s]tatements made for purposes of medical diagnosis or treatment." Rule 11-803(D). At the hearing on Defendant's motion to suppress, both the prosecution and the defense had an opportunity to question Nurse Lopez about her SANE examination, including the purpose of specific questions posed and answers elicited from T.F. In response, Nurse Lopez explained how, in her judgment, most of the questions and answers pertained to medical diagnosis or treatment of T.F.

3

**{12}** No other witnesses were called, and after additional argument from counsel, the trial court ruled to exclude every statement by T.F. to Nurse Lopez, expressly relying on the prior holding of our Court of Appeals in *Ortega*, which we will discuss in more detail later in this Opinion. The trial court explained its reasoning as follows: "I find that *Ortega*, in fact, specifically excludes 803(D) hearsay exception for SANE exam, and this might be a good case for the [a]ppellate [c]ourts to take a look at this ruling, but I think <u>Ortega</u> excludes it. I don't see there are any exceptions." In other words, as interpreted by the trial court, SANE examinations do not qualify for the hearsay exception under Rule 11-803(D) as a matter of law after *Ortega*. The State appealed, and the Court of Appeals affirmed, again on the basis of *Ortega*. Concluding that the primary purpose of Nurse Lopez's examination was to gather evidence, not to provide medical care, the Court of Appeals held that T.F.'s statements were not made "for purposes of medical diagnosis or treatment" within the meaning of Rule 11-803(D). *State v. Mendez*, 2009-NMCA-060, ¶¶ 31-37, 146 N.M. 409, 211 P.3d 206.

**{13}** We granted the State's petition for the writ of certiorari to clarify existing law pertaining to Rule 11-803(D) generally, and more specifically as that rule should apply to statements made during SANE examinations of victims of sexual assault. We necessarily review the continued vitality of at least portions of *Ortega.*

**{14}** The State invoked interlocutory appellate jurisdiction pursuant to NMSA 1978, Section 39-3-3(B)(2) (1972). That statute allows the State to file an interlocutory appeal from a trial court order suppressing evidence when "the appeal is not taken for purpose of delay and . . . the evidence is a substantial proof of a fact material in the proceeding." *Id.* As the Court of Appeals correctly noted, evidence of statements "identifying the perpetrator and describing the criminal acts . . . is central to any criminal case." *Mendez*, 2009-NMCA-060, ¶ 12. Because the evidence excluded by the trial court in this case could constitute substantial proof of a material fact, the State's interlocutory appeal is appropriate.

**{15}** We conduct our review in this case under a different standard from that applied by the Court of Appeals, which reviewed the trial court's ruling for an abuse of discretion. Although that is the correct standard for evidentiary rulings, this case turns on the legal question of whether *Ortega* correctly held that the "purpose of the interview" controls the admissibility of all statements made during a SANE interview under Rule 11-803(D). *See Ortega*, 2008-NMCA-001, ¶¶ 16-27. Accordingly, we review both the trial court's ruling and *Ortega* de novo. *Davis v. Devon Energy Corp.*, 2009-NMSC-048, ¶ 12, 147 N.M. 157, 218 P.3d 75 (a question of law is reviewed de novo).

**DISCUSSION**

**{16}** The Court of Appeals opinion in *Ortega* is central to our analysis. Like the present appeal, *Ortega* arose from child sexual abuse in which the state sought to admit the child's statements made to a SANE nurse as "[s]tatements made for purposes of medical diagnosis or treatment" under Rule 11-803(D). *Ortega*, 2008-NMSC-001, ¶¶ 2-4, 8, 16.

4

**{17}** Importantly, the child victim in *Ortega* was *not* available to testify in person, compelling the state to use the child's hearsay statements as substantive evidence against the accused which, in turn, gave rise to serious constitutional issues under the Confrontation Clause of the Sixth Amendment to the United States Constitution. By contrast, T.F. is expected to testify when this case proceeds to trial. Apparently, the State seeks to use T.F.'s out-of-court statements to Nurse Lopez to supplement, not to supplant, the child's in-court testimony at trial. Clearly, those statements are hearsay; the question is whether they are admissible as an exception to the hearsay rule. The present appeal concerns only our hearsay exception under Rule 11-803(D).

**{18}** The Court of Appeals in *Ortega* addressed both Rule 11-803(D) and the Confrontation Clause. 2008-NMCA-001, ¶¶ 14-27. It upheld the trial court's ruling to exclude the statements on constitutional grounds, but disagreed with the trial court's assessment under Rule 11-803(D). *Ortega*, 2008-NMCA-001, ¶¶ 16-17, 27, 36. The *Ortega* Court focused on what it assessed was the primary purpose of a SANE examination—the gathering of evidence—and concluded that *all* of the child's statements were inadmissible. *Id.* ¶¶ 18-20. As more fully explained herein, we disagree with this "primary purpose of the encounter" approach to determining admissibility under Rule 11-803(D). To provide some background for our analysis, we begin by examining the basis for admitting statements under the proper standard.

**The touchstone of admissibility under Rule 11-803(D) is the trustworthiness of each statement.**

**{19}** The hearsay rule excludes from admissible evidence statements that are inherently untrustworthy because of the risk of misperception, failed memory, insincerity, ambiguity, and the like. *See In re Esperanza M.*, 1998-NMCA-039, ¶ 9, 124 N.M. 735, 955 P.2d 204; 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:3, at 28-33 (3d ed. 2007). Unlike live testimony at trial, out-of-court hearsay statements lack traditional safeguards: testimony offered under oath, subject to penalty of perjury, and most importantly subject to the crucible of cross-examination. *See State v. Self*, 88 N.M. 37, 41, 536 P.2d 1093, 1097 (Ct. App. 1975). There are, however, numerous exceptions to the hearsay rule when statements made by an out-of-court declarant nevertheless possess circumstantial guarantees of reliability sufficient to make the statements trustworthy and admissible. *See id.* One such exception is Rule 11-803(D), which provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

**{20}** Two underlying rationales traditionally animate Rule 11-803(D). First, the "help-

seeking motivation" counsels that the declarant's self-interest in obtaining proper medical attention renders "the usual risks of hearsay testimony . . . minimal when associated with medical treatment." *Esperanza M.*, 1998-NMCA-039, ¶ 9. Indeed, statements made at the time of treatment may be *more* reliable than live testimony from the declarant offered at trial months or even years later. *See White v. Illinois*, 502 U.S. 346, 356 (1992) ("[A] statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony.").

**{21}** The second rationale behind Rule 11-803(D), commonly referred to as "pertinence," is that if a statement is pertinent to a medical condition, such that a medical care provider reasonably relies upon it in arriving at a diagnosis or treatment, the statement is deemed sufficiently reliable to overcome hearsay concerns. *Morgan v. Foretich*, 846 F.2d 941, 951 (4th Cir. 1988) (Powell, J., concurring in part and dissenting in part[2]) ("[A] fact reliable enough to serve as a basis for a physician's diagnosis or treatment generally is considered sufficiently reliable to escape hearsay proscription."). At common law, these two rationales were considered separate, independent requirements, each of which had to be satisfied to admit statements under the Rule. *See id.*; *United States v. Iron Shell*, 633 F.2d 77, 84 (8th Cir. 1980).

**{22}** While some jurisdictions retain a two-part test for determining admissibility, several others including New Mexico regard the "pertinence" rationale to be independently sufficient to establish trustworthiness and admissibility under Rule 11-803(D). *Compare* 4 Michael H. Graham, *Handbook of Federal Evidence* § 803:4, at 175-78 (6th ed. 2006) (citing jurisdictions that impose traditional two-part requirement), *with State v. Massengill*, 2003-NMCA-024, ¶ 25, 133 N.M. 263, 62 P.3d 354 ("'[U]nlike the common law rule, [Rule 11-803(D)] does not require inquiry into the patient's motive in making the statement,' so long as the statements were relied upon by the physician." (quoting *State v. Altgilbers*, 109 N.M. 453, 460, 786 P.2d 680, 687 (Ct. App. 1989))); *Esperanza M.*, 1998-NMCA-039, ¶ 14 ("[T]his Court and our Supreme Court have relied on the foundation established by the party seeking to admit the hearsay testimony that testimony is admissible if it is 'reasonably pertinent' for medical diagnosis or treatment." (citing *State v. Woodward*, 121 N.M. 1, 8, 908 P.2d 231, 238 (1995), *abrogation recognized by State v. Granillo-Macias*, 2008-NMCA-021, 143 N.M. 455, 176 P.3d 1187)); *Altgilbers*, 109 N.M. at 459-60, 786 P.2d at 686-87; *and* Graham, *supra* § 803:4, at 178 ("A third group of jurisdictions does not require a specific showing of motive; rather, they inquire whether the subject-matter of the declarant's statement was reasonably pertinent to diagnosis or treatment.").

**{23}** Justice Powell found this approach—focusing only on the pertinence of the statement to medical diagnosis or treatment—to be particularly preferable in child sexual abuse cases,

---

[2]Retired from the United States Supreme Court, Justice Powell was sitting with a panel of the Fourth Circuit Court of Appeals in *Morgan*.

where it may be unclear whether the declarant child understands the relationship between being truthful and receiving medical care. *Morgan*, 846 F.2d 941 at 951-52. However, as Justice Powell conceded, evidence admitted under this standard "has less inherent reliability than evidence admitted under the traditional common-law standard underlying the physician treatment rule." *Id.* at 952. Thus, while we agree with the conclusion in *Altgilbers* and other persuasive precedents that the "pertinence" rationale alone can provide a sufficient basis upon which to admit a statement under Rule 11-803(D), we would not go so far as to ignore the help-seeking motivation of the declarant altogether, whether in a child sexual abuse setting or any other case. The better approach, in our view, is for trial courts to take *both* rationales into consideration, depending on the circumstances of each case, focusing all the while on the trustworthiness of each statement. Trustworthiness can be established under either rationale alone, or some degree of both. In any event, trial courts are best suited to consider the relevant facts and circumstances of a given case in order to make the ultimate determination.

**Focusing on the overall purpose of the encounter, instead of the trustworthiness of each statement, oversimplifies the 11-803(D) inquiry and creates an arbitrary distinction between admissible and inadmissible hearsay.**

**{24}**    We turn first to a closer analysis of *Ortega* and its progeny to examine whether these opinions conform to, or contradict, our jurisprudence interpreting Rule 11-803(D). *See State v. Tafoya*, 2010-NMCA-010, ¶¶ 33-36, 147 N.M. 602, 227 P.3d 92; *Mendez*, 2009-NMCA-060, ¶¶ 29-30; *Ortega*, 2008-NMCA-001, ¶¶ 16-27. These cases appear to stand for the proposition that courts must categorically exclude *all* statements made during the course of an encounter, the primary purpose of which is not medical, regardless of whether any individual statement might be for a valid medical purpose. More specifically, these three cases seem to exclude most all such statements made to a SANE nurse because of the overall forensic aspect of the SANE examination. *See Ortega*, 2008-NMCA-001, ¶ 21 ("We think the district court fairly characterized the SANE exam as a 'forensic exam with medical features.'"). Clearly, that is how the trial court in this case interpreted *Ortega* and its progeny.

**{25}**    In *Ortega*, a mother suspected her boyfriend of sexually abusing her child, and took the child to an emergency room for an examination. *Id.* ¶ 2. During a SANE examination with police present, physical evidence was collected for possible use in a subsequent criminal prosecution. *Id.* ¶ 3. Four days later, the child was taken for a second examination with the head nurse in the SANE program, who performed only a patient-history interview. *Id.* ¶¶ 2-4. When the child was asked if she knew why she was at the SANE examination, the child provided a narrative of the sexual abuse, which the state sought to admit at trial under Rule 11-803(D). *Id.* ¶¶ 5, 8. As previously noted, the child was not available to testify at trial. Although concluding that the statements would be admissible under Rule 11-803(D), the trial court nevertheless ruled that "Confrontation Clause issues trumped a valid hearsay exception," and excluded the statements because the child did not appear for trial. *Ortega*, 2008-NMCA-001, ¶ 16.

**{26}** In affirming the trial court's ruling, the Court of Appeals in *Ortega* merged the analytical framework for determining admissibility under Rule 11-803(D) with that of constitutionality under the Confrontation Clause, stating, "[b]oth [Rule 11-803(D)] and *Crawford* jurisprudence draw our focus to the 'purpose' of the interview or interrogation in which a statement is taken." *Ortega*, 2008-NMCA-001, ¶ 18 (referring to *Crawford v. Washington*, 541 U.S. 36 (2004)). The Court concluded that the primary purpose of the SANE interview was evidence-gathering, not medical diagnosis or treatment, which made any resulting statements "testimonial" and inadmissible under *Crawford*. *Ortega*, 2008-NMCA-001, ¶ 26. The Court then used this conclusion as the basis for its hearsay analysis, reasoning that if the purpose of the interview is forensic, then any resulting statements are not made for purposes of medical diagnosis or treatment under Rule 11-803(D). *Ortega*, 2008-NMCA-001, ¶ 26. In other words, *Ortega* for the first time conflated the criteria for Confrontation Clause analysis and hearsay under Rule 11-803(D): "We also recognize that the statements [to the SANE nurse] may have had a medical purpose, but that does not preclude statements from also being testimonial." *Id.* ¶ 22.

**{27}** The "primary purpose of the encounter" approach in *Ortega* is derived from the United States Supreme Court's Confrontation Clause jurisprudence. The Court began by quoting the principal holding in the United States Supreme Court's post-*Crawford* opinion in *Davis v. Washington*, 547 U.S. 813, 822 (2006):

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the *primary purpose* of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Ortega*, 2008-NMCA-001, ¶ 28 (emphasis added). Without a single mention of trustworthiness, *Ortega* aligned its Rule 11-803(D) admissibility analysis with its Confrontation Clause analysis, stating that the purpose of a statement made during a SANE examination "exists in concert with the very things that might make a statement obtained thereby testimonial under [Confrontation Clause cases]," *Ortega*, 2008-NMCA-001, ¶ 21, and later that "it is the *primary purpose* of the interview with a declarant that triggers the nature of the statement obtained in its course," *id.* ¶¶ 26-27 (emphasis added). It is on this point that we part company with the Court of Appeals in *Ortega* with respect to Rule 11-803(D).

**{28}** The hearsay rule and the Confrontation Clause are not co-extensive and must remain distinct. The hearsay rule is intended to ensure that the jury is not exposed to unreliable evidence, even when the declarant testifies at trial and is subject to cross-examination. The Confrontation Clause guarantees the accused in a criminal trial the right "to be confronted with the witnesses against him," regardless of how trustworthy the out-of-court statement

8

may appear to be. U.S. Const. amend. VI. More important for present purposes, the unique dangers each seeks to avoid can be implicated under quite distinct circumstances. As the United States Supreme Court explained in *Crawford*,

> not all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, *ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them.

541 U.S. at 51.

**{29}**    Conflating the Rule 11-803(D) and Confrontation Clause inquiries—as *Ortega* clearly did—misses an important distinction between the two. In *Crawford*, the United States Supreme Court listed several examples of the "core class of 'testimonial' statements" which trigger Confrontation Clause concerns, including

> *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . extrajudicial statements . . . contained in formalized testimonial materials . . . statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

541 U.S. at 51-52 (internal quotation marks and citations omitted). What these examples have in common is that they lend themselves to an analysis that focuses largely on surrounding circumstances to separate testimonial from non-testimonial statements.[3]

**{30}**    For example, once an individual prepares an affidavit, the reliability of any single statement is largely irrelevant for constitutional purposes because it will *all* be testimonial and inadmissible under the Sixth Amendment without a prior opportunity for cross-examination. The act of preparing an affidavit evinces the preparer's awareness that each statement could be used at trial. As another example, consider the facts of *Davis*, which involved hearsay statements made during an emergency 911 call. 547 U.S. 817-18. As the United States Supreme Court noted, at a definitive point during the 911 call, the emergency

---

[3]For an in-depth discussion of the Confrontation Clause issues surrounding statements made to medical personnel, *see* Dave Gordon, *Is There an Accuser in the House?: Evaluating Statements Made to Physicians and Other Medical Personnel in the Wake of* Crawford v. Washington *and* Davis v. Washington, 38 N.M. L. Rev. 529 (2008).

had subsided. *Id.* at 828-29. After that point, the caller was no longer engaged in meeting an ongoing emergency, but rather was engaged in providing "past events," rendering all statements after that point testimonial. *Id.* Again, the circumstances surrounding the statements (whether the emergency was ongoing) largely defined the nature of the statements themselves for purposes of constitutional analysis.

**{31}** In contrast, under Rule 11-803(D), a declarant could make a statement for entirely medical purposes even if the primary purpose of the interview has become forensic. The converse is also true. Even during an initial encounter for medical purposes, the declarant could make a statement entirely unrelated to medical diagnosis or treatment, thus failing to satisfy Rule 11-803(D). Unlike the Confrontation Clause context, in which the surrounding circumstances determine whether the declarant is "bearing testimony," the medical or non-medical purpose of a statement cannot be determined without closely examining the *substance* of the statement. Surrounding circumstances are certainly relevant, but the focus must center on the individual statement.[4]

**{32}** The Court of Appeals opinion in the present case followed *Ortega*'s approach. The Court found a "critical demarcation" between the initial pediatric consultation and the SANE examination at the Family Advocacy Center where, at least in the Court's view, the purpose of the encounter between Nurse Lopez and T.F. "changed from a medical examination into a criminal investigation." *Mendez*, 2009-NMCA-060, ¶ 31. The Court of Appeals acknowledged that SANE exams have "medical aspects," and even conceded that during *this* SANE exam Nurse Lopez appeared to have an earnest, medical objective of looking for the cause of T.F.'s bleeding. *Id.* ¶¶ 32-34. Nevertheless, the Court's focus on the SANE interview's "essential nature" and "primary purpose" dominated its analysis, obscuring any consideration of whether individual statements may have been reasonably pertinent to medical diagnosis or treatment. *Id.* ¶¶ 34-35. Having concluded, consistently with *Ortega*, that the primary purpose of the examination was forensic—as one would assume with most

---

[4]By way of analogy, we note that a statement-by-statement inquiry is consistent with our approach to admissibility under a completely different hearsay exception. Rule 11-804(B)(3) NMRA (statements against penal interests). In *State v. Torres*, we noted that the word "statement" in Rule 11-804(B)(3) directs courts to evaluate individual declarations. 1998-NMSC-052, ¶ 14, 126 N.M. 477, 971 P.2d 1267, *overruled on other grounds by State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 23, 136 N.M. 309, 98 P.3d 699. We rejected an all-or-nothing approach to evaluating the declarant's statements made during a particular encounter, electing instead to focus on *individual statements* to determine admissibility. *Id.* We have also rejected a hyper-technical application of Rule 11-804(B)(3) that would isolate strictly admissible statements from the context in which they were made. *See State v. Gonzales*, 1999-NMSC-033, ¶ 7, 128 N.M. 44, 989 P.2d 419. Thus, as with Rule 11-803(D), the proper Rule 11-804(B)(3) analysis requires a statement-by-statement analysis, taking into consideration the context of the statement as well as the circumstances under which the statement was made.

SANE examinations—the Court upheld the trial court's decision to exclude all of T.F.'s statements. *Id.* ¶¶ 29-31.

**{33}** Since its opinion in the present case, the Court of Appeals has issued yet another opinion that follows the *Ortega* approach. *See Tafoya*, 2010-NMCA-010. On facts strikingly similar to those of the present case, the *Tafoya* court upheld the trial court's decision to *admit* statements made by the child sexual assault victim to the examining nurse, distinguishing *Mendez* and *Ortega* on their facts. *Tafoya*, 2010-NMCA-010, ¶ 36. A closer look reveals that none of the putative factual distinctions provide a principled basis for administering Rule 11-803(D). Rather, as we will discuss shortly, the categorical exclusion of all statements made to a SANE nurse in *Ortega* and *Mendez*, but not in *Tafoya*, exposes the *Ortega* "purpose of the encounter" approach as overly broad and unfairly condemnatory. Because it is fundamentally flawed, it draws an arbitrary and indefensible distinction between admissible and inadmissible hearsay.

**{34}** As an example, one fact of importance to the Court of Appeals in *Tafoya* was that the child's statements were made during the initial pediatric examination, not at a separate SANE examination, as occurred in *Ortega* and *Mendez. Tafoya*, 2010-NMCA-010, ¶ 34. We agree that statements made during a patient-history examination that occurs four days after an initial physical examination, as in *Ortega*, might be less pertinent to treating a medical condition, and that the declarant might be less motivated to seek help in making statements at that later point in time. Certainly it would be within a trial court's discretion to arrive at that assessment. But the SANE examination of T.F. in this case occurred the same evening as the initial examination, and the source of T.F.'s bleeding had not yet been determined. A trial court could quite reasonably conclude that T.F. had the same help-seeking motivation at the Family Advocacy Center as she had at Arroyo Chamiso less than two hours earlier; indeed, she was confiding in the same medical care provider (Nurse Lopez) at both locations.

**{35}** Furthermore, Nurse Lopez testified that she did not have the specialized equipment necessary to conduct an internal examination of T.F. at Arroyo Chamiso, and that "just to be safe medically, it was appropriate to have [T.F.] seen as soon as possible with a more focused exam" at the Family Advocacy Center. Given Nurse Lopez's testimony, any information obtained at the latter location might have been equally "pertinent" to her diagnosis or treatment of T.F. *See In re Rachel T.*, 549 A.2d 27, 34 (Md. Ct. Spec. App. 1988) (unexplained bleeding supported conclusion that child sexual abuse victim's statements during medical examination were for purposes of medical treatment). The nurse in *Tafoya* performed similar examinations to those performed by Nurse Lopez in this case, and she did so at a facility specially equipped to treat child victims of sexual abuse. In addition, like Nurse Lopez in this case, the nurse in *Tafoya* was trained to collect evidence of sexual abuse that could be used by police to build a case against the perpetrator. 2010-NMCA-010, ¶ 36. That the nurse in *Tafoya* performed her examination at one location instead of two, strikes us as a hollow basis for categorically excluding statements under Rule 11-803(D).

**{36}** Another distinction drawn by *Tafoya* was that in *Ortega* and *Mendez*, police were present during the interview and more directly involved or interested in the collection of evidence. *Tafoya*, 2010-NMCA-010, ¶ 36. The record in this case is unclear about whether police were present in the room where the patient-history interview with T.F. took place. But even if the police *were* present in the room, this should not automatically define the nature of T.F.'s statements for hearsay purposes, as *Mendez* and *Tafoya* suggest.

**{37}** SANE nurses, like all medical professionals, are under a legal obligation to report possible sexual abuse to the police. *See* NMSA 1978, § 32A-4-3(A) (2005) (requiring every person, including medical professionals, who suspect that a child has been abused or neglected to immediately report the matter to authorities). Absent some evidence that the police were attempting to manipulate the examination, we would not place dispositive weight on their presence on the premises or even in the examination room. *See Esperanza M.*, 1998-NMCA-039, ¶ 10 ("We consider it immaterial whether the examination was part of an investigation, so long as it was for diagnosis or treatment.").

**{38}** We must not lose sight of the fact that Rule 11-803(D) questions in the criminal context frequently involve a victim being treated for injuries sustained as a result of an alleged criminal act, and police as well as medical personnel often become involved in the investigation. *See* Dave Gordon, *Is There an Accuser in the House?: Evaluating Statements Made to Physicians and Other Medical Personnel in the Wake of* Crawford v. Washington *and* Davis v. Washington, 38 N.M. L. Rev. 529, 529 (2008). That should not categorically exclude a victim's statements from evidence. Nor, as we discuss in the next section, should we categorically exclude medically pertinent statements just because they were made to a SANE nurse, when those same statements would be admissible if made to a doctor or to a nurse in the emergency room.

**{39}** The diversion created by *Ortega* is that it directs courts to determine the purpose of the encounter, instead of considering the substance of, and circumstances surrounding, individual statements. This approach is irreconcilable with previous hearsay opinions in which our courts have focused on particular statements, determining in each instance the purpose for which the statement was made. *See Esperanza M.*, 1998-NMCA-039, ¶¶ 16-17 (examining individual statements and surrounding circumstances to determine admissibility); *State ex rel. Children, Youth & Families Dep't v. Frank G.*, 2005-NMCA-026, ¶ 31, 137 N.M. 137, 108 P.3d 543 ("The Child's statements about the sexual abuse were of the type upon which medical personnel reasonably rely in treatment or diagnosis and meet the standards for admission set forth in Rule 11-803(D)."). The Court of Appeals acknowledged as much in its opinion below, stating, "even if the facts in *Esperanza M.* and the other cases we have just cited can be considered equivalent of those in this case, we believe *Ortega*, which specifically recognized that statements made to a SANE nurse are not predominantly for diagnosis and treatment, has changed the legal landscape." *Mendez*, 2009-NMCA-060, ¶ 40.

**{40}** We agree that *Ortega* changed the fundamental approach to analyzing statements

under Rule 11-803(D), at least for statements made to SANE nurses. In so doing, it shifted the focus away from the trustworthiness of the statement. We now restore the "legal landscape" in this area of the law, and partially overrule *Ortega* to the extent of its discussion of the admissibility of hearsay statements under Rule 11-803(D). We do not disturb *Ortega*'s discussion of constitutional issues.

**Statements made to a SANE nurse can be admissible for purposes of medical diagnosis or treatment, but trial courts must exercise exacting scrutiny to ensure trustworthiness.**

**{41}**     We acknowledge the special challenges posed by determining the admissibility of statements made to SANE nurses under Rule 11-803(D), but we reject the notion that statements can be categorically excluded based on the professional status or affiliation of the individual to whom the statement is made. SANE nurses fill a void in our medical system, providing critical treatment to patients at a time of great physical, emotional, and psychological vulnerability. As the State points out, SANE nurses may be better suited to provide this treatment due to their special training than non-SANE nurses and physicians. But they also have special expertise in gathering evidence for subsequent prosecution of the offender, which raises appropriate concerns about whether the statement was made for the purposes of seeking medical care  or whether a medical provider could have reasonably relied upon the statement for diagnosis or treatment of the declarant.

**{42}**     Both Defendant and the State seem to agree that SANE nurses have a *dual* role:  the provision of medical care and the collection and preservation of evidence. As the State's brief explains, SANE nurses "are overall more competent than emergency room[] doctors and non-SANE nurses at collecting and preserving evidence of value to the legal system." *See* Campbell, *supra* at 321 ("SANEs collect forensic evidence correctly and, in fact, do so better than physicians."). When compared with other medical providers, the goals of SANE nurses and SANE examinations can seem more closely aligned with law enforcement, which presents an acute risk that the SANE nurse's expert status can be abused to allow an end-run on the hearsay rule. Trial courts must be aware of the potential for such abuses, subjecting to close scrutiny the exchange between SANE nurse and patient to determine the statement's overall trustworthiness under Rule 11-803(D) in light of the two rationales highlighted above.

**{43}**     SANE nurses may be more adept at collecting and preserving evidence, but any medical provider who treats sexual abuse victims is engaged to some extent in the collection of evidence, and most understand that the evidence they collect—physical or otherwise—could be used in a subsequent prosecution. *See* Robert P. Mosteller, *Testing the Testimonial Concept and Exceptions to Confrontation:  "A Little Child Shall Lead Them,"* 82 Ind. L. J. 917, 952 (Fall 2007) ("There is every reason to assume that the vast majority of doctors and nurses are aware both of reporting requirements and the admissibility of many statements made to them during the examination process. The medical examination thus always has the potential to feed directly into the criminal process, and use of the statements at trial is an obvious possibility." (footnote omitted)). The trial court must therefore

carefully parse each statement made to a SANE nurse to determine whether the statement is sufficiently trustworthy, focusing on the declarant's motivation to seek medical care and whether a medical provider could have reasonably relied on the statement for diagnosing or treating the declarant.

**{44}**     Defendant goes too far in asserting that Nurse Lopez was simply "well coached" and "able to articulate a 'medical' reason" for asking the questions that elicited the challenged statements. At the evidentiary hearing, Nurse Lopez was questioned about the purpose of asking various questions during the patient-history interview with T.F. Several examples of this exchange include:

| [State:] | The next question that you asked was where did your Grandpa touch you? |
|---|---|
| | . . . . |
| [State:] | What was your intention in asking that question? |
| | . . . . |
| [Nurse Lopez:] | [L]ooking for body-to-body contact, where could there possibly be injury, if any, to this child. |
| | . . . . |
| [State:] | [Y]ou followed up . . . asking if he touched her with any other part of his body, what was the purpose . . .? |
| [Nurse Lopez:] | [J]ust to see if there's any other possibility of being touched by any other body part. Again the other thing that could somewhat go to this is the possibility of any body fluid coming in contact with the child. |
| | . . . . |
| [State:] | [Y]ou asked, . . . how did your body feel when he touched your privates with his dick, what did you mean by that question? |
| [Nurse Lopez:] | What that means is more, did you have pain. [T]rying to figure out if there's another cause for the bleeding . . . . |

14

. . . .

[State:]                    [A]sking if he put anything on his dick when he
                            touched her, what was the purpose in asking that
                            question?

[Nurse Lopez:]              This has to do with was their [sic] a condom used,
                            does she have any risks of sexually transmitted
                            infections that may come to her . . . if the body was
                            actually exposed to an adult male body part.

**{45}** If Nurse Lopez were a treating physician or attending nurse in an emergency room, much of this exchange would likely be admissible under any interpretation of Rule 11-803(D). Yet SANE nurses regularly treat victims of sexual abuse that require critical medical attention. We have stated today that a trial court should consider the context and circumstances under which a statement was made, but at the very least, T.F.'s statements in this case should not have been *categorically* excluded based on Nurse Lopez's status as a SANE nurse. *See United States v. Gonzalez*, 533 F.3d 1057, 1062 (9th Cir. 2008) (A "[registered nurse and sexual examiner] was collecting evidence, but that forensic function did not obliterate her role as a nurse, in a hospital, performing a medical examination of a victim of a sexual assault. It would have been unprofessional for [nurse] to have treated [victim] without eliciting an account of what had happened to her.").

**{46}** The record before us does not suggest that the trial court doubted Nurse Lopez's veracity or judgment, but relied instead on *Ortega*'s "primary purpose of the encounter" inquiry. *See State v. Lovato*, 112 N.M. 517, 521, 817 P.2d 251, 255 (Ct. App. 1991) (stating that a fact-finder should state in the record reasons for rejecting uncontradicted testimony solely on credibility grounds). It would make our job far easier simply to exclude all statements made during SANE examinations. We would do so, however, at the substantial risk of excluding statements that are otherwise trustworthy, vital to the prosecution, and fair to the accused. Our hearsay rule was not intended to create such an injustice. Our courts must once again shoulder the heavy responsibility of sifting through statements, piece-by-piece, making individual decisions on each one. On remand the trial court will need to evaluate the trustworthiness of each of T.F.'s statements, taking into consideration T.F.'s help-seeking motivation and the pertinence of such statements to medical diagnosis or treatment.[5]

---

[5]A number of jurisdictions have considered admissibility in light of the SANE nurse's dual role. Consistent with our analysis today, these jurisdictions have held that a statement is admissible if it was made for a medical purpose, even if it was also made for a forensic purpose, and that statements in this context should be only excluded if the purpose was exclusively forensic. *See State v. Payne*, 694 S.E.2d 935 (W.Va. 2010) (citing similar holdings in cases from North Carolina, Maryland, North Dakota, and Texas); *State v.*

15

**The record reveals several statements that could be admissible under the proper analysis.**

{47}    We address some of the specific statements at issue in this case, but not to adjudicate their admissibility, because that question is not yet ripe for our decision. We do so for illustrative purposes alone.  We emphasize that on remand the trial court will have broad discretion to determine the admissibility of T.F.'s statements. This Opinion is not intended to dictate a particular outcome, but rather to free the trial court of the confines previously imposed by *Ortega.*

{48}    On reflection, it appears that several of T.F.'s statements could be admissible, in the discretion of the trial court, under the proper Rule 11-803(D) analysis.  For example, Nurse Lopez stated in her SANE report that she asked T.F., "What made you bleed?" to which T.F. responded, "He put his finger inside and it hurt."  She also asked, "What happened to your body?" to which T.F. responded,  "I got tuched [sic] by a man."  When Nurse Lopez later asked, "A few weeks ago when you were bleeding, what happened to your body?" T.F. replied, "I was bleeding alot [sic]." Knowing the patient's account of what happened to her body helps medical care providers determine the best way to proceed in diagnosing and ultimately treating any injury.  As one authority in the field has observed, "to develop history for the purpose of diagnosis and treatment, a doctor may ask about past events that led to the current condition.  Both past and present symptoms and causes are medically relevant to the assessment and treatment of any patient, including children who may have been abused." Mosteller, *supra* at 971.

{49}    The trial court could reasonably conclude that T.F. understood that her bleeding was serious or, at least, that she understood the importance of answering Nurse Lopez honestly, or that Nurse Lopez  would have been justified in reasonably relying upon such statements to diagnose or treat T.F.   Certainly, a trial court could look at the statements above as squarely within the confines of Rule 11-803(D) under either of the underlying rationales we have discussed.

{50}    In contrast, some of the challenged statements might present a rather attenuated link to the rationales behind Rule 11-803(D).  For instance, Nurse Lopez asked, after T.F. stated that Defendant touched her, "Where were you when he did this?"  Nurse Lopez also asked, "Did he ask you not to tell?"  At one point, T.F. stated that Defendant had sex with her step-

---

*Keeton*, No. 03 CA 43, 2004 WL 1549421, *13 (Ohio Ct. App. July 9, 2004) (dual medical and forensic purpose does not render statement to doctor or nurse inadmissible).  At least one jurisdiction has addressed the matter by creating hearsay rules designed to deal specifically with statements by child victims of sexual abuse. *See, e.g.*, Fla. Stat. Ann. § 90.803(23) (2003) (Florida rule of evidence, admitting hearsay statements of child under 11 regarding sexual or other abuse, subject to various conditions such as reliability, unavailability, and specific findings of fact by the court).

16

cousin. Nurse Lopez then asked, "What's your step cousin's name?" At the hearing, Nurse Lopez did not provide a medical purpose for these particular statements, nor did she explain how they contributed to her understanding of T.F.'s medical condition.

**{51}** T.F.'s statement specifically identifying Defendant as her abuser presents a much more difficult question. At the hearing on Defendant's motion to suppress, Nurse Lopez explained that identity is relevant to removing the child from an unsafe environment and to aid in determining what injuries to look for based on the age and size of the accused.

**{52}** As a general matter, statements of fault or identity are inadmissible under the hearsay exception for purposes of medical diagnosis or treatment because they are not pertinent to treatment or diagnosis. *Altgilbers*, 109 N.M. at 459, 786 P.2d at 686. The example provided in the committee commentary to the federal rule is "a patient's statement that he was struck by an automobile would qualify but not his statement that the car was driven through a red light." Fed. R. Evid. 803 advisory committee's note to ¶ 4. Like the statement that the car was driven through a red light, a statement about who was driving the car has nothing to do with the provision of medical care, and so lacks pertinence and the circumstantial guarantees of trustworthiness that the hearsay exception envisions.

**{53}** However, along with what has been described as a majority of jurisdictions, New Mexico recognizes an exception to this principle where the identity of the perpetrator is pertinent to psychological treatment, or where treatment involves separating the victim from the source of the abuse. *See Frank G.*, 2005-NMCA-026, ¶ 30 ("First, a proper diagnosis of a child's psychological problems resulting from sexual abuse or rape will often depend on the identity of the abuser. Second, information that a child sexual abuser is a member of the patient's household is reasonably pertinent to a course of treatment that includes removing the child from the home."); *see also Altgilbers*, 109 N.M. at 459, 786 P.2d at 686 ("In dealing with child sexual abuse, however, disclosure of the perpetrator may be essential to diagnosis and treatment."); *United States v. Renville*, 779 F.2d 430, 437-38 (8th Cir. 1985) (explaining that "child abuse involves more than physical injury; the physician must be attentive to treating the emotional and psychological injuries which accompany this crime," and that "physicians have an obligation, imposed by state law, to prevent an abused child from being returned to an environment in which he or she cannot be adequately protected from recurrent abuse"); *United States v. Lingle*, 27 M.J. 704, 707 (A.F.C.M.R. 1988) ("[W]e find a trend in both military and civilian courts to permit the admission of identification evidence under Rule 803(4) in child abuse cases. The rationale for allowing such evidence is both reasonable and medically logical as there can be psychological as well as physical problems resulting from child abuse."); *Blake v. State*, 933 P.2d 474, 477 n.2 (Wyo. 1997) ("an overwhelming majority of jurisdictions, including at least 32 states and 4 federal circuits, allow into evidence statements regarding the identity of the perpetrator in child physical or sexual assault cases"). On remand, the trial court must carefully consider, in light of these cases, whether T.F.'s statement naming Defendant as her abuser merits admission under Rule 11-803(D).

**{54}** Finally, even if a statement is deemed trustworthy under Rule 11-803(D), trial courts must carefully weigh its probative value against the prejudice it might cause the accused. *See* Rule 11-403 NMRA ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). The State bears the burden of laying the proper foundation for admitting statements under Rule 11-803(D) and Rule 11-403. As Justice Powell stated, "[i]t must be remembered that, in addition to assuring the fair presentation of a plaintiff's case, the district court has the responsibility of shielding defendants from the admission of unduly prejudicial evidence." *Morgan*, 846 F.2d at 951.

**{55}** Having only the perspective of a limited record, we are in a far inferior position to that of the trial court to make a final determination on the admissibility of any of these statements. Accordingly, we remand to the trial court to exercise its discretion in a manner consistent with our discussion in this Opinion. It is appropriate for a trial court to subject statements made to a SANE nurse to greater scrutiny than those made to other medical care providers, although statements might be admissible or inadmissible in either case depending on the circumstances before the court. Trial courts are specially equipped to evaluate the import of these circumstances, but admissibility of any statement under Rule 11-803(D) must turn, ultimately, on its trustworthiness. It bears repeating that our discussion herein pertains only to admissibility under Rule 11-803(D), and not to constitutional considerations addressed in *Ortega* and similar authorities.

## CONCLUSION

**{56}** We reverse the ruling of the Court of Appeals regarding the admissibility of statements under Rule 11-803(D). We remand to the trial court for proceedings consistent with this Opinion.

**{57}** **IT IS SO ORDERED**.

 

_____
       **RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

**EDWARD L. CHÁVEZ, Justice**

**Topic Index for *State v. Mendez*, Docket No. 31,723**

**AE**        **APPEAL & ERROR**
**AP-IA**      Interlocutory Appeal

**CT**        **CONSTITUTIONAL LAW**
**CT-CT**     Confrontation

**CA**        **CRIMINAL PROCEDURE**
**CA-EH**     Evidentiary Hearing
**CA-RT**     Right to Confrontation

**EV**        **EVIDENCE**
**EV-AE**     Admissibility of Evidence
**EV-HR**     Hearsay Evidence
**EV-PB**     Probative Value v. Prejudicial Effect
**EV-SU**     Suppression of Evidence
**EV-WT**     Witnesses