# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2022-NMCA-029

Filing Date: December 1, 2021

No. A-1-CA-38063

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**LUCIO GODINEZ, JR.,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**James W. Counts, District Judge**

Certiorari Granted, April 22, 2022, No. S-1-SC-39151. Released for Publication June 21, 2022.

Hector H. Balderas, Attorney General
Santa Fe, NM
John Kloss, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**IVES, Judge.**

**{1}**    Defendant Lucio Godinez, Jr. appeals the revocation of his probation, arguing in part that the district court violated his due process right to confront and cross-examine witnesses at the revocation hearing. The key precedent that guides us is *State v. Guthrie*, in which our Supreme Court recognized that a person who is accused of a probation violation has a due process right "to confront and cross-examine adverse witnesses []unless the hearing officer specifically finds good cause for not allowing

confrontation[.]" 2011-NMSC-014, ¶ 12, 150 N.M. 84, 257 P.3d 904 (emphasis, internal quotation marks, and citation omitted). In *Guthrie*, the Court described general principles and specific factors that New Mexico courts should consider when determining whether "good cause" exists, and the Court considered those principles and factors in deciding that a probationer who was accused of failing to complete a treatment program did not have a due process right to confront his probation officer. *Id.* ¶¶ 45-49. Defining the inquiry as an assessment of "the necessity for, and utility of, confrontation with respect to the truth-finding process," the *Guthrie* Court made that determination in the context of "straightforward and routine charges—the simple, objective, and uncontroverted fact that probationer either did or did not successfully complete the program[.]" *Id.* ¶ 21 (internal quotation marks and citation omitted). Defendant's appeal requires us to apply *Guthrie* in a very different context—one our appellate courts have not previously addressed in a precedential opinion. Here, the State accused Defendant of violating his probation by committing a new crime, criminal sexual penetration of his daughter, and the district court determined that Defendant did not have a right to confront and cross-examine Daughter. Applying *Guthrie* to a set of facts not clearly contemplated by the governing framework that *Guthrie* created, we conclude, based on the record before us, that Defendant had a due process right to confront Daughter. Because the district court did not afford Defendant any opportunity to do so, we reverse and remand for any further proceedings that might be necessary, including a new revocation hearing if the State requests one.[1]

**BACKGROUND**

**{2}** In 2011, Defendant pleaded no contest to two counts of second-degree criminal sexual contact of a minor, contrary to NMSA 1978, Section 30-9-13(B) (2003). The district court entered judgment on Defendant's plea and sentenced Defendant to nine years' imprisonment for each count. The court made the two sentences consecutive and suspended all but two years of Defendant's eighteen-year sentence. The court also imposed a five-to-twenty-year probationary term to follow the two-year prison term. *See generally* NMSA 1978, § 31-20-5.2(A), (F)(3) (2003).

**{3}** Defendant completed his prison term in 2013. In 2018, the State sought to revoke Defendant's probation, alleging that Defendant violated its conditions by (1) omitting Daughter's autism diagnosis when he requested permission from his probation officer to have her stay with him and (2) committing criminal sexual penetration against Daughter.

**{4}** At the hearing on the State's petition to revoke Defendant's probation, the district court heard testimony from Defendant's probation officer, Daughter's mother, a sexual assault nurse examiner (SANE), a forensic safehouse interviewer, and a New Mexico State Police officer. Aside from noting the fact of Defendant's arrest on suspicion of violating the condition of his probation that he not commit any new crimes, the probation officer only testified to evidence of the allegation that Defendant violated his probation

---

1Because we reverse under *Guthrie*, we do not reach Defendant's argument that the district court erred by relying upon certain hearsay evidence in reaching its ultimate decision.

by failing to report Daughter's disability. Defendant denied that he had committed criminal sexual penetration against Daughter.

**{5}**     Daughter did not testify. The State presented evidence that Daughter's condition was likely to regress if she had to testify in court about the alleged crime. The State's evidence consisted of witnesses' testimony about statements made by Daughter. The remainder of the State's evidence was testimony regarding witnesses' personal observations of Daughter's demeanor and physical condition after the alleged crime, as well as evidence of blood and the DNA of an unidentified male on some of Daughter's underwear.

**{6}**     Mother testified that Daughter, an adult who functioned at a first-grade level intellectually, had been visiting Defendant for what had been planned as a two-week stay. Near the end of those two weeks, Daughter did not call in the morning like she normally would. After Daughter did not answer Mother's call, Mother called Defendant who, after first saying he was too busy to put Daughter on the phone, did so after Mother demanded to speak with Daughter. When Defendant put Daughter on the phone, Daughter was "hysterical" and asked to be picked up.[2] Mother went to pick up Daughter and, when Defendant arrived at a meeting place with Daughter, Daughter was leaning against the window of Defendant's car and crying. Daughter hugged Mother while crying and did not say goodbye to Defendant, which was unusual. On their way home, Daughter said, "I'm tired; I'm tired," and she told Mother that she never wanted to return to Defendant's home. When they arrived home, Daughter hugged Mother's fiancé and again began to cry and went to sleep soon thereafter. According to Mother, over the next few days, Daughter acted unusually and appeared "distraught": Daughter at times followed Mother around the house and at other times sat idly on the couch rather than doing the things she would have normally done; cried "loudly" in the shower, where Mother would find her in the tub; woke in the night and screamed; hit the table; and asked, "Why? Why? Why, dad?" Mother asked Daughter if Defendant had done something to her, and Daughter pointed to "her behind" and asked to talk to the police. According to Mother, Daughter said that Defendant "hit her" and that "it" happened twice.

**{7}**     Mother also testified that she observed blood on underwear in the suitcase Daughter had taken for her stay with Defendant. And the State elicited testimony from Mother indicating that the blood could not be attributable to Daughter's menstrual cycle because she had her period at the end of June, after her stay with Defendant, which was during the middle of the month. There was, however, conflicting testimony on this point: the SANE testified that Daughter stated at her examination that she had menstruated the previous Sunday, in the middle of the month. The police officer testified that on June 22, 2018, as much as one week after the alleged crime, he collected some of the clothing Daughter had taken for her stay with Defendant and brought it to the state crime lab. He testified that the crime lab found male DNA on the "inside crotch area" of Daughter's underwear but that the DNA had not been compared to that of any

---

2Defendant's girlfriend had been hospitalized the day before Mother called Daughter, and there was no dispute that Defendant was alone with Daughter between that time and the call.

particular person. Although he testified that he had collected a DNA sample from Defendant, the results of a comparison to that sample were still pending at the time of the hearing, and the police officer read from the initial crime lab report that no comparison would be possible because of how little DNA had been found.

**{8}** The SANE testified that when she examined Daughter on Friday, June 22, she asked Daughter whether "the assault had occurred on Sunday," and Daughter nodded affirmatively. The SANE noted tears "throughout the exam" and that Daughter trembled during the anal portion of the examination. Although the SANE did not observe any injuries to Daughter's genital or anal areas, the SANE explained that skin in the vaginal and anal areas heals quickly. The SANE did observe bruising on Daughter's buttocks, thighs, and near her genitals; that her vagina was "red"; and a white vaginal discharge that, according to the SANE, could have had various causes. The SANE explained that she is trained not to opine on the age of a bruise, and, though she noted the differing coloration of Daughter's bruises, she did not testify to the severity of the bruising she observed. Although the SANE testified that she had seen similar bruising in earlier work she had done on cases involving criminal sexual contact, she explained that things other than sexual contact could have caused everything she observed at Daughter's examination.

**{9}** A forensic interviewer testified about Daughter's safehouse interview. The interviewer explained that she had to question Daughter as if she were interviewing a five- or six-year-old child. The interviewer testified that, during the interview, Daughter said that her "butt got hurt" "on the inside" as a result of two "spanking[s]" that occurred while neither she nor Defendant were wearing underwear and that, during these incidents, she was lying face down with Defendant behind her. The interviewer testified that she asked Daughter to identify, on a drawing of a nude male body, the body part Defendant had used to hurt her, and Daughter circled the penis. And she told the interviewer that she was still experiencing pain at the time of the interview, which occurred approximately one week after the alleged criminal sexual penetration.

**{10}** Defendant objected to the admission of Daughter's out-of-court statements through the forensic interviewer's testimony and the admission of DNA evidence through the police officer's testimony. The district court overruled the objections but did not make factual findings as to whether there was good cause to admit the challenged evidence without allowing Defendant to confront Daughter or the crime lab analyst who reported the DNA evidence. After the close of evidence, the district court cited, as corroboration for the unconfronted evidence, testimony of Mother regarding physical evidence and changes in Daughter's behavior. And the court concluded that the evidence established to a reasonable certainty that Defendant had violated a condition of his probation by committing a sex crime, citing, in addition to Mother's testimony, the police officer's testimony that the crime lab noted the presence of male DNA on some of Daughter's underwear and the SANE's testimony that Daughter presented with bruising at the SANE examination. However, the district court rejected the State's contention that Defendant also violated his probation by failing to report Daughter's disability.

**{11}** The district court revoked Defendant's probation and remanded him to the New Mexico Corrections Department for a period of just under eleven years, the remainder of the suspended portion of the sentence for his 2011 convictions. Defendant appeals.

## DISCUSSION

**{12}** Defendant argues that the district court deprived him of due process by denying him, without good cause, an opportunity to confront Daughter and the crime lab analyst. Whether Defendant suffered a violation of his due process right to confrontation is a question of law that we review "de novo while deferring to the district court's factual findings."[3] *State v. Castillo*, 2012-NMCA-116, ¶ 9, 290 P.3d 727. For the reasons that follow, we agree with Defendant that there was not good cause to dispense with confrontation as to Daughter, and we therefore reverse without reaching Defendant's argument as to the crime lab analyst.

**{13}** "Because loss of probation is loss of only conditional liberty, 'the full panoply of rights due a defendant in a criminal trial [does] not apply.' " *Guthrie*, 2011-NMSC-014, ¶ 10 (alteration omitted) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)); *see also Gagnon v. Scarpelli*, 411 U.S. 778, 781-82 (1973) (extending *Morrissey*—which concerned revocation of parole—to revocation of probation). However, defendants who face allegations that they have violated their probation have a due process right " 'to confront and cross-examine adverse witnesses []unless the hearing officer specifically finds good cause for not allowing confrontation[.]' " *Guthrie*, 2011-NMSC-014, ¶ 12 (emphasis omitted) (quoting *Gagnon*, 411 U.S. at 786). Hence, at a probation violation hearing, there is a "rebuttable presumption" that the probationer has a right to confront adverse witnesses. *State v. Wheeler*, No. S-1-SC-37709, dec. ¶ 17 (N.M. Sup. Ct. June 10, 2021) (non-precedential). *Guthrie* indicates that this presumption is especially strong, and thus more onerous to rebut, when, as in this case, the state seeks to revoke probation based on an unadjudicated charge that the probationer committed another crime. 2011-NMSC-014, ¶¶ 36, 38. The *Guthrie* Court stated that, where "the probationer is alleged to have committed a crime[] but has not been convicted," it "would be hard[-]pressed to envision a situation in which personal testimony and confrontation

---

3The State argues that we should not review Defendant's arguments, contending that (1) he did not preserve them because his objections at trial were on different grounds from those he makes on appeal; and (2) because he did not object to hearsay in the testimony of other witnesses, he "actively waived" his arguments on appeal. We disagree. Defendant invoked rulings on (1) whether admitting Daughter's statements through the forensic interviewer's testimony, without any opportunity to cross-examine Daughter, would be erroneous and (2) whether admitting the crime lab report through the police officer's testimony violated Defendant's right to confrontation. And, in arguing those objections, the parties narrowed the question before the district court to whether due process prohibited the court from admitting the challenged hearsay when Defendant would not have an opportunity to cross-examine either declarant. Nor did Defendant waive these issues. The State emphasizes the admission, without objection, of several statements Daughter purportedly made to Mother and the SANE, but the hearsay to which Defendant did object was not cumulative of that evidence. *Cf. State v. La Madrid*, 1997-NMCA-057, ¶¶ 16-17, 123 N.M. 463, 943 P.2d 110 (rejecting a claim that the district court had committed reversible error by admitting certain hearsay statements because the defendant had "acquiesce[d] in the admission of . . . the same statement[s]").

would not be required." *Id.* ¶ 38 (emphasis omitted); *see also Wheeler*, No. S-1-SC-37709, dec. ¶ 21.

**{14}**   In analyzing whether due process requires confrontation or whether there is good cause to proceed without confrontation, a court should locate the particular evidentiary issue on a "spectrum or sliding scale with extremes at either end and much balancing and weighing of competing interests in between." *Guthrie*, 2011-NMSC-014, ¶ 40. The court must assess "the relative need for confrontation to protect the truth-finding process and the substantial reliability of the evidence," and "the stronger the probative value and reliability of the evidence, the less the need for confrontation." *Id.* ¶¶ 43-44. The focus should not be the reasons for the declarant's absence, *id.*, but instead "fundamental fairness, the touchstone of due process." *Id.* ¶ 25 (internal quotation marks and citation omitted). Where evidentiary issues fall on the spectrum depends "on a case-by-case analysis" of "the utility of confrontation." *Id.* ¶ 33.

**{15}**   Our Supreme Court has explained that this analysis involves an indefinite number of factors, *id.* ¶¶ 34-41, and we glean five factors from *Guthrie* relevant to the analysis in this case: (1) whether the source of the challenged evidence is reliable and free of any motive to lie, *id.* ¶¶ 40-41; (2) the centrality of the challenged evidence to the ultimate conclusion about whether a probation violation occurred, *id.* ¶¶ 34, 37, 41; (3) whether the accused contests the fact that the challenged evidence would help prove, *id.* ¶¶ 35, 40-41; (4) the extent to which credibility determinations, perception, interpretation, inference, and judgment are required to decide the truth of the matter asserted by the declarant's statements, *id.* ¶¶ 37-41; and (5) whether the challenged evidence is substantially reliable, either because it is inherently reliable—e.g., hearsay admissible under a "proven exception[]" to the rule against hearsay, *id.* ¶ 36—or because it is sufficiently corroborated by other, reliable evidence. *Id.* ¶¶ 40-41.

**{16}**   Applying these factors to Defendant's case,[4] we hold that there was not good cause to dispense with confrontation because the evidence presented at the hearing was not reliable enough to overcome the strong presumption that Defendant had a right to confront Daughter about the unadjudicated accusation that he had committed a new crime. As we will explain, Daughter's hearsay statements and thus her credibility were at the heart of this case. Those statements were neither inherently reliable nor sufficiently corroborated by other, reliable evidence, and cross-examination was therefore necessary to safeguard the truth-seeking process at the revocation hearing.

**{17}**   Because we have no reason to doubt that the forensic interviewer testified accurately about what Daughter told her, *see id.* ¶¶ 40-41, we turn to the remaining factors, beginning with the critical role played by Daughter's hearsay statements to the interviewer. Those hearsay statements were central to the ultimate determination of whether Defendant violated his probation by committing a new crime. *See id.* ¶¶ 34, 37, 41. Indeed, those statements were the most probative evidence—and the *only* direct

---

4Recognizing that, in *Guthrie*, our Supreme Court did not identify each factor that bears on the utility of confrontation in every case, we have considered whether any additional factors might bear on this case. Having identified none, we limit our analysis to the factors from *Guthrie* described in the text.

evidence—that Defendant had committed criminal sexual penetration as the State alleged. Moreover, the commission of a new crime was an affirmative fact that Defendant contested by denying that he had abused Daughter. *See id.* ¶¶ 35, 37, 40-41. Under these circumstances, discovering whether the State's allegation is true involves credibility determinations, perception, interpretation, inference, and judgment, and it was thus important to observe Daughter's demeanor. *See id.* ¶¶ 34, 37-41; *cf. State v. Lucero*, 1993-NMSC-064, ¶¶ 2, 22, 116 N.M. 450, 863 P.2d 1071 (stating that the credibility of a child who had accused the defendant of sexual abuse "was a pivotal issue" in a trial where "[t]he only witnesses to the alleged abuse were the defendant and the [alleged victim]"); *State v. Duran*, 2015-NMCA-015, ¶¶ 2-4, 25-26, 343 P.3d 207 (characterizing credibility as "the primary issue" in a trial where the alleged victim testified that the defendant had sexually abused her when she was a child but the defendant denied the accusation).

**{18}** Our analysis thus far having reinforced rather than rebutted the strong presumption in favor of confrontation, we turn to the final factor, reliability. We first address whether Daughter's statements are inherently reliable. *See Guthrie*, 2011-NMSC-014, ¶ 36. The State argues that they are because they would be admissible in a trial under Rule 11-803(4) NMRA, the exception to the rule against hearsay for statements made for medical diagnosis or treatment. *See Guthrie*, 2011-NMSC-014, ¶ 36 ("[H]earsay evidence may be inherently reliable if it conforms to proven exceptions to the hearsay rule."). We disagree. Because the forensic interviewer was not a medical provider, her testimony as to what Daughter told her would not be admissible under Rule 11-803(4). The testimony at issue here is unlike the testimony at issue in *State v. Mendez*, where our Supreme Court recognized that statements made to a SANE may sometimes be admissible as statements made for medical diagnosis or treatment because a SANE has "a *dual* role: the provision of medical care and the collection and preservation of evidence." 2010-NMSC-044, ¶¶ 41-43, 148 N.M. 761, 242 P.3d 328. But the witness here was not a SANE. She was a forensic interviewer whose testimony gives us no reason to conclude that she had any role other than collecting, preserving, and analyzing evidence; the record does not include any basis for concluding that a purpose of her examination was medical diagnosis or treatment. *Cf. Duran*, 2015-NMCA-015, ¶¶ 4-5 (recounting the testimony of a safehouse interviewer who explained that the goal of a forensic safehouse interview is to test the truth of an allegation that a child was a victim or witness to a crime). We therefore reject the State's argument that Daughter's statements to the forensic interviewer conform to a proven hearsay exception, and we see no other reason to conclude that her statements are inherently reliable.

**{19}** Because Daughter's hearsay statements are not inherently reliable, *Guthrie* permits us to conclude that her statements are substantially reliable only if they are sufficiently corroborated by other, reliable evidence. *See Guthrie*, 2011-NMSC-014, ¶¶ 40-41. Although the *Guthrie* Court did not explicitly describe how courts should determine whether corroborating evidence is powerful enough to obviate the need for confrontation, our Supreme Court took a case-specific approach to the good cause inquiry in *Guthrie*, and we therefore conclude that the corroboration determination

hinges on the nature of the allegation and the facts of each case. The inquiry is not whether the corroborating evidence in the case would support a rational inference by the trial court judge that the accused is guilty but instead whether cross-examination of the declarant would assist the judge in deciding whether the accused is, in fact, guilty. *See id.* ¶ 43 (emphasizing that courts should focus "on the need for, and utility of, confrontation with respect to the truth-finding process . . . in light of the particular case at hand, including the specific charge pressed against the probationer"); *cf. Morrissey*, 408 U.S. at 483-84 (stating that revocation of parole should not occur without "an appropriate determination that the individual has in fact breached the conditions of parole" and explaining that the accused and society share an interest in such determinations resting on "accurate knowledge of the parolee's behavior"). Reading *Guthrie* holistically and focusing on the overarching principles that drove our Supreme Court's analysis, *see generally* 2011-NMSC-014, ¶ 43, we conclude that only unequivocal and reliable corroborating evidence will make the value of confrontation so minimal as to be unnecessary when, as in this case, the state makes a contested allegation that the probationer committed a new crime but there is no adjudication of guilt; the hearsay statements are central to the state's case but are not inherently reliable; and determining whether the statements are true entails a subjective judgment about the declarant's credibility. Under these circumstances, confrontation is essential to the truth-finding process unless corroborating evidence compellingly establishes that the crime occurred and that the probationer committed it.

{20}   We conclude that the evidence in this case does not clear this high bar. Because the evidence offered to corroborate the declarant's statements is subject to conflicting interpretations, confrontation was necessary to increase the likelihood that the district court arrived at the truth. *Cf. California v. Green*, 399 U.S. 149, 158 (1970) (recognizing that cross-examination is "the greatest legal engine ever invented for the discovery of truth" (internal quotation marks and citation omitted)); *State v. Montoya*, 2014-NMSC-032, ¶ 39, 333 P.3d 935 ("For two centuries, common law judges and lawyers have regarded the opportunity of cross-examination as an essential safeguard of the accuracy and completeness of testimony." (emphases, internal quotation marks, and citation omitted)). As corroboration for Daughter's hearsay statements, the district court cited Mother's testimony that Daughter's demeanor changed after visiting Defendant and that Mother observed blood on Daughter's underwear that was unlikely to have been due to menstruation.[5] The only other corroborating evidence was the police officer's testimony that there was male DNA on the underwear[6] and the SANE's

---

5Our review is complicated somewhat by the fact that the district court made its factual findings regarding the admissibility of the challenged evidence after the close of evidence, at the same time that it announced its findings supporting its conclusion on the merits—that the evidence demonstrated to a reasonable certainty that Defendant had violated his probation by committing a sex crime against Daughter. Although the district court did not make any findings specific to whether the DNA evidence was admissible without cross-examination of the crime lab analyst, it found that the male DNA on Daughter's underwear likely was Defendant's. And the court found that the bruising observed at the SANE examination had some significance. As we understand the record, the district court made these findings to support its conclusion on the merits.

6In analyzing whether the other evidence sufficiently corroborated of the hearsay in the forensic interviewer's testimony, we assume without deciding that there was good cause to dispense with

testimony about her observations at Daughter's examination.[7] Although all of this evidence is consistent with the State's allegation, it is subject to conflicting interpretations and thus does not compellingly establish the truth of the allegation so as to render confrontation unnecessary. Mother's observations corroborate the accusation of criminal sexual penetration to some extent; they amount to circumstantial evidence that is consistent with the accusation. Nevertheless, everything Mother observed could have had an explanation other than sexual abuse. The behavior Mother observed in Daughter could have been a response to suffering criminal sexual penetration, or it could have been a manifestation of some other trauma. And the conflicting testimony about the timing of Daughter's menstruation renders ambiguous the import of the blood Mother observed. The DNA evidence also has some corroborative value. However, there was no evidence to support that the DNA evidence was indicative of sexual contact versus something like handling the underwear because the evidence did not establish what sort of bodily material transferred the DNA. In addition, the male DNA found on Daughter's underwear had not been and, according to the lab report, would not be matched with Defendant's DNA. Hence, the DNA found on Daughter's underwear may have been related to sexual contact or may not have been, and it may or may not have been Defendant's. Under these circumstances, the import of the DNA evidence is ambiguous. Similarly, although the SANE's testimony supports the inference that Daughter was sexually abused, it also allows for the interpretation that sexual abuse might not be the explanation for Daughter's physical condition at the SANE examination, which occurred as much as one week after the alleged crime. Because the corroborating evidence is subject to conflicting interpretations, we conclude that, even when viewed as a whole, it does not compellingly establish that

---

confrontation as to the crime lab analyst and that the findings of the crime lab were thus admissible through the testimony of the police officer.

[7]Various pieces of evidence have no impact our analysis. First, contrary to the State's argument, a recording of Daughter's unconfronted safehouse interview is not corroborating evidence, not least because it appears from the record that the district court did not view the recording, and the recording therefore could not have influenced the court's decision to dispense with confrontation. *Cf. State v. Myers*, 2008-NMCA-047, ¶¶ 6, 8, 10, 143 N.M. 710, 181 P.3d 702 (declining to incorporate certain video evidence into a review of the sufficiency of the evidence because the district court had not considered it in rendering its verdict), *rev'd on other grounds*, 2009-NMSC-016, 146 N.M. 128, 207 P.3d 1105. In addition, the probation officer's testimony regarding Defendant's failure to report Daughter's disability has only de minimis corroborative value. The same is true of the testimony the State elicited from both Mother and the police officer seeking to demonstrate that Defendant had evinced a consciousness of guilt. Mother testified that another of her daughters told her that her son said that he was going to help Defendant "fix his finances" because Defendant would be going "somewhere." And the police officer recounted an interview he conducted of Defendant after Defendant had been jailed on suspicion of committing a probation violation. According to the police officer, Defendant said that, before his arrest, Mother had asked him why he had "hit" Daughter. Defendant denied abusing Daughter but told the police officer that, because of Mother's accusation and his criminal history, he expected that he might "be blamed." Because of the vagueness of Mother's testimony and the lack of evidence as to whether the statements regarding Defendant going "somewhere" were made before or after Defendant learned that he was being accused of abusing Daughter, we do not view that testimony as corroborating of the allegation that Defendant committed a sex crime against Daughter. And we do not view Defendant's statement to the police officer that he expected to "be blamed" as an admission or awareness of guilt when Defendant made the statement after his arrest, already charged with violating his probation in relation to Daughter's stay with him.

Daughter's hearsay statements are reliable enough to render confrontation unnecessary.

**{21}** Finally, we address the State's argument that the need to protect Daughter from further emotional harm supports the conclusion that there was good cause for dispensing with confrontation. The State relies on *State v. Herrera*, in which the state, in a trial on charges of criminal sexual contact of a minor, introduced video depositions of the two victims in lieu of the victims' direct testimony. 2004-NMCA-015, ¶¶ 2-3, 7, 135 N.M. 79, 84 P.3d 696. *See generally* NMSA 1978, § 30-9-17 (1978); Rule 5-504 NMRA. Allowing the use of deposition testimony under such circumstances is meant to protect victims from "suffering unreasonable and unnecessary mental or emotional harm" while ensuring that defendants are "given an adequate opportunity to cross-examine" those victims. Rule 5-504(B). However, *Herrera* has no bearing on our analysis because here, unlike in *Herrera*, the State never sought to introduce deposition testimony to obviate the need for live testimony, and Defendant never had "an adequate opportunity to cross-examine" Daughter. Rule 5-504(B)(3). This case does not present the question of whether affording the accused an opportunity to confront a vulnerable alleged victim in a deposition, rather than during the revocation hearing itself, would satisfy due process under *Guthrie*.

**{22}** Instead, the question before us is whether it is consistent with due process to deny Defendant any opportunity whatsoever to confront Daughter because of her vulnerability. We recognize that the New Mexico Constitution protects Daughter's right to be treated with fairness and with respect for her dignity and privacy, *see* N.M. Const. art. II, § 24(A)(1), and that the risk that Daughter would suffer harm was likely the reason she did not testify. However, *Guthrie* requires us to focus less on why the declarant did not testify and more on "the need for, and utility of, confrontation with respect to the truth-finding process . . . in light of the particular case at hand, including the specific charge pressed against the probationer." 2011-NMSC-014, ¶ 43. Where "that need is significant," the declarant "must appear and be subject to confrontation, regardless of the reasons for his or her absence[,]" which are, "for the most part, irrelevant" to the analysis. *Id.* Whatever limited weight *Guthrie* permits us to give to Daughter's vulnerability, it is outweighed by the considerations our Supreme Court has identified as pertinent to the need for confrontation and the reliability of the evidence.

**{23}** Based on our application of *Guthrie* to this case, we conclude that no showing of good cause rebutted the strong presumption in favor of confrontation. In short, we cannot conclude, on the record before us, that this is the case our Supreme Court was "hard[-]pressed to envision"—one in which "personal testimony and confrontation [are not] required" to prove that the accused committed a new crime. *Id.* ¶ 38. We therefore hold that Defendant was denied due process when the district court relied on

Daughter's hearsay statements to the forensic interviewer without affording Defendant any opportunity to confront Daughter.[8]

**{24}** We emphasize that our holding is narrow. We address only the question presented: whether the complete denial of Defendant's request for confrontation, which prevented the defense from conducting *any* cross-examination of Daughter, violated Defendant's right to due process. Accordingly, we offer no opinion about the type of confrontation or the scope of cross-examination that would satisfy due process under *Guthrie* while protecting Daughter's rights under Article II, Section 24 of the New Mexico Constitution. *See Gagnon*, 411 U.S. at 782 n.5 (explaining that states may develop "creative solutions to the practical difficulties" of ensuring due process in probation violation hearings); *Guthrie*, 2011-NMSC-014, ¶ 11 (recognizing that "due process is flexible and calls for such procedural protections as the particular situation demands" and that "not all situations calling for procedural safeguards call for the same kind of procedure" (emphasis, internal quotation marks, and citation omitted)); *cf. State v. Fairweather*, 1993-NMSC-065, ¶¶ 23-31, 116 N.M. 456, 863 P.2d 1077 (holding that the use of video recordings of depositions of child victims of sexual abuse in a criminal trial did not violate the defendant's Sixth Amendment right to confrontation, where defense counsel cross-examined the victims and the defendant viewed the depositions by television monitor in another room and was able to confer with counsel during the depositions); *State v. Smith*, 2001-NMSC-004, ¶ 23, 130 N.M. 117, 19 P.3d 254 (recognizing that, even in the context of a criminal trial, "the trial court has broad discretion to control the scope of cross-examination").

**CONCLUSION**

**{25}** We reverse the order revoking Defendant's probation and remand for any further proceedings that might be necessary, including a new revocation hearing if the State requests one.

**{26}   IT IS SO ORDERED.**

**ZACHARY A. IVES, Judge**

**WE CONCUR:**

**JACQUELINE R. MEDINA, Judge**

---

8Because we hold that Defendant was denied his due process right to confront Daughter, we need not determine whether there was good cause to dispense with confrontation as to the crime lab analyst. Should the State request a new revocation hearing and seek to introduce hearsay like the crime lab report at issue in this appeal, we note that this Court has previously identified particular "minimum requirements" for the admission of that kind of evidence at a probation violation hearing. *See generally State v. Sanchez*, 2001-NMCA-060, ¶¶ 17-18, 130 N.M. 602, 28 P.3d 1143. And if Defendant raises the issue, the district court should analyze, consistent with *Guthrie* and this opinion, whether there is good cause for admitting the evidence without affording Defendant an opportunity to confront its author.

**SHAMMARA H. HENDERSON, Judge**